## McPHERSON v. BLACKER.

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 1170.   Argued Oct. 11, 1892. — Decided Oct. 17, 1892.

The validity of a state law providing for the appointment of electors of
President and Vice President having been drawn in question before the
highest tribunal of a State, as repugnant to the laws and Constitution of
the United States, and that court having decided in favor of its validity,
this court has jurisdiction to review the judgment under Rev. Stat. § 709.

Under the second clause of Article II of the Constitution, the legislatures
of the several States have exclusive power to direct the manner in which
the electors of President and Vice President shall be appointed.

Such appointment may be made by the legislatures directly, or by popular.
vote in districts, or by general ticket, as may be provided by the
legislature.

If the terms of the clause left the question of power in doubt, contempora-
neous and continuous subsequent practical construction has determined
the question as above stated.

The second clause of Article II of the Constitution was not amended by the
Fourteenth and Fifteenth Amendments, and they do not limit the power
of appointment to the particular manner pursued at the time of the
adoption of these amendments, or secure to every male inhabitant of a
State, being a citizen of the United States, the right from the time of
his majority to vote for presidential electors.

A state law fixing a date for the meeting of electors, differing from that
prescribed by the act of Congress, is not thereby wholly invalidated; but
the date may be rejected and the law stand.

WILLIAM McPherson, Jr., Jay A. Hubbell, J. Henry Carstens, Charles E. Hiscock, Otto Ihling, Philip T. Colgrove, Conrad G. Swensburg, Henry A. Haigh, James H. White, Fred. Slocum, Justus S. Stearns, John Millen, Julius T. Hannah, and J. H. Comstock filed their petition and affidavits in the Supreme Court of the State of Michigan, on May 2, 1892, as nominees for presidential electors, against Robert R. Blacker, Secretary of State of Michigan, praying that the court declare the act of the legislature, approved May 1, 1891, (Act No. 50 of the Public Acts of Michigan of 1891), entitled "An act to provide for the election of electors of President and Vice President of the United States, and to repeal all other acts and parts of acts in conflict herewith," void and of no effect, and that a writ of mandamus be directed to be issued to the said Secretary of State, commanding him to cause to be delivered to the sheriff of each county in the State, between the first of July and the first of September, 1892, " a notice in writing that at the next general election in this State, to be held on Tuesday, the 8th day of November, 1892, there will be chosen (among other officers to be named in said notice) as many electors of President and Vice President of the United States as this State may be entitled to elect Senators and Representatives in the Congress."

The statute of Michigan, (Howell's Ann. Stats. of Michigan, 133, c. 9,) provided: " The secretary of state shall, between the first day of July and the first day of September preceding a general election, direct and cause to be delivered to the sheriff of each county in this State, a notice in writing, that at the next general election there will be chosen as many of the following officers as are to be elected at such general election, viz. : A governor, lieutenant governor, secretary of state, state treasurer, auditor general, attorney general, superintendent of public instruction, commissioner of the state land office, members of the state board of education, electors of President and Vice President of the United States, and a representative in Congress for the district to which each of such counties shall belong."

A rule to show cause having been issued, the respondent, as

secretary of state, answered the petition, and denied that he had refused to give the notice thus required, but he said, "That it has always been the custom in the office of the secretary of state, in giving notices under said section 147, to state in the notice the number of electors that should be printed on the ticket in each voting-precinct in each county in this State, and following such custom with reference to such notice, it is the intention of this respondent in giving notice under section 147 to state in said notice that there will be elected one presidential elector at large, and one district presidential elector, and two alternate presidential electors, one for the elector at large and one for the district presidential elector, in each voting-precinct, so that the election may be held under and in accordance with the provisions of act No. 50 of the Public Acts of the State of Michigan of 1891."

By an amended answer the respondent claimed the same benefit as if he had demurred.

Relators relied in their petition upon various grounds as invalidating act No. 50 of the Public Acts of Michigan of 1891, and among them, that the act was void because in conflict with clause two of section one of Article II of the Constitution of the United States, and with the Fourteenth Amendment to that instrument, and also in some of its provisions in conflict with the act of Congress of February 3, 1887, entitled "An act to fix the day for the meeting of the electors of President and Vice President, and to provide for and regulate the counting of the votes for President and Vice President, and the decision of questions arising thereon." The Supreme Court of Michigan unanimously held that none of the objections urged against the validity of the act were tenable; that it did not conflict with clause two of section one of Article II of the Constitution or with the Fourteenth Amendment thereof; and that the law was only inoperative so far as in conflict with the law of Congress in a matter in reference to which Congress had the right to legislate. The opinion of the court will be found reported, in advance of the official series, in 52 Northwestern Rep. 469.

Judgment was given, June 17, 1892, denying the writ of

mandamus, whereupon a writ of error was allowed to this court.

The October term, 1892, commenced on Monday, October 10, and on Tuesday, October 11, the first day upon which the application could be made, a motion to advance the case was submitted by counsel, granted at once in view of the exigency disclosed upon the face of the papers, and the cause heard that day. The attention of the court having been called to other provisions of the election laws of Michigan than those supposed to be immediately involved, (Act No. 190, Public Acts, Michigan, 1891, pp. 258, 263), the Chief Justice, on Monday, October 17, announced the conclusions of the court, and directed the entry of judgment affirming the judgment of the Supreme Court of Michigan, and ordering the mandate to issue at once, it being stated that this was done because immediate action under the state statutes was apparently required and might be affected by delay, but it was added that the court would thereafter file an opinion stating fully the grounds of the decision.

Act No. 50 of the Public Acts of 1891 of Michigan is as follows:

" An act to provide for the election of electors of President and Vice President of the United States, and to repeal all other acts and parts of acts in conflict herewith.

" SECTION 1. *The People of the State of Michigan enact,* That at the general election next preceding the choice of President and Vice President of the United States, there shall be elected as many electors of President and Vice President as this State may be entitled to elect of Senators and Representatives in Congress in the following manner, that is to say: There shall be elected by the electors of the districts hereinafter defined one elector of President and Vice President of the United States in each district who shall be known and designated on the ballot, respectively, as eastern district elector of President and Vice President of the United States at large, and western district elector of President and Vice President of the United States at large; there shall also be elected in like manner two alternate electors of President and

Vice President, who shall be known and designated on the ballot, as eastern district alternate elector of President and Vice President of the United States at large, and western district alternate elector of President and Vice President of the United States at large, for which purpose the first, second, sixth, seventh, eighth and tenth congressional districts shall compose one district to be known as the eastern electoral district, and the third, fourth, fifth, ninth, eleventh and twelfth congressional districts shall compose the other district, to be known as the western electoral district; there shall also be elected by the electors in each congressional district into which the State is or shall be divided, one elector of President and Vice President, and one alternate elector of President and Vice President, the ballots for which shall designate the number of the congressional district and the persons to be voted for therein, as district elector and alternate district elector of President and Vice President of the United States respectively.

"SEC. 2. The counting, canvassing and certifying of the votes cast for said electors at large, and their alternates and said district electors and their alternates, shall be done, as near as may be, in the same manner as is now provided by law for the election of electors of President and Vice President of the United States.

"SEC. 3. The Secretary of State shall prepare three lists of the names of the electors and the alternate electors, procure thereto the signature of the governor, affix the seal of the State to the same, and deliver such certificates thus signed and sealed to one of the electors on or before the first Wednesday of December next following said general election. In case of death, disability, refusal to act or neglect to attend, by the hour of twelve o'clock at noon of said day, of either of said electors at large, the duties of the office shall be performed by the alternate electors at large, that is to say: The eastern district alternate elector at large shall supply the place of the eastern district elector at large, and the western district alternate elector at large shall supply the place of the western district elector at large. In like case, the alternate congressional

district elector shall supply the place of the congressional district elector. In case two or more persons have an equal and the highest number of votes for any office created by this act as canvassed by the board of state canvassers, the legislature in joint convention shall choose one of said persons to fill such office, and it shall be the duty of the governor to convene the legislature in special session for such purpose immediately upon such determination by said board of state canvassers.

"SEC. 4. The said electors of President and Vice President shall convene in the senate chamber at the capital of the State at the hour of twelve o'clock at noon, on the first Wednesday of December immediately following their election, and shall proceed to perform the duties of such electors as required by the Constitution and the laws of the United States. The alternate electors shall also be in attendance, but shall take no part in the proceedings except as herein provided.

"SEC. 5. Each of said electors and alternate electors shall receive the sum of five dollars for each day's attendance at the meetings of the electors as above provided, and five cents per mile for the actual and necessary distance travelled each way in going to and returning from said place of meeting, the same to be paid by the state treasurer upon the allowance of the board of state auditors.

"SEC. 6. All acts and parts of acts in conflict with the provisions of this act are hereby repealed." Approved May 1, 1891.

Section 211 of Howell's Annotated Statutes of Michigan (vol. 1, c. 9. p. 145) reads:

"For the purpose of canvassing and ascertaining the votes given for electors of President and Vice President of the United States, the board of state canvassers shall meet on the Wednesday next after the third Monday of November, or on such other day before that time as the secretary of state shall appoint; and the powers, duties, and proceedings of said board, and of the secretary of state, in sending for, examining, ascertaining, determining, certifying and recording the votes and results of the election of such electors, shall be in all respects, as near as may be, as hereinbefore provided in

relation to sending for, examining, ascertaining, determining; certifying and recording the votes and results of the election of State officers."

Section 240 of Howell's Statutes, in force prior to May 1, 1891, provided: "At the general election next preceding the choice of President and Vice President of the United States, there shall be elected by general ticket as many electors of President and Vice President, as this State may be entitled to elect of Senators and Representatives in Congress."

The following are sections of Article VIII of the Constitution of Michigan:

"SEC. 4. The secretary of state, state treasurer, and commissioner of the state land office shall constitute a board of State auditors, to examine and adjust all claims against the State, not otherwise provided for by general law. They shall constitute a board of state canvassers, to determine the result of all elections for governor, lieutenant-governor, and state officers, and of such other officers as shall by law be referred to them.

"SEC. 5. In case two or more persons have an equal and the highest number of votes for any office, as canvassed by the board of state canvassers, the legislature in joint convention shall choose one of said persons to fill such office. When the determination of the board of state canvassers is contested, the legislature in joint convention shall decide which person is elected." (1 Howell's Ann. Stats. Mich. 57.)

Reference was also made in argument to the act of Congress of February 3, 1887, to fix the day for the meeting of the electors of President and Vice-President, and to provide for and regulate the counting of the votes. 24 Stat. 373, c. 90.

*Mr. Henry M. Duffield, Mr. Fisher A. Baker,* and *Mr. Attorney General* for plaintiffs in error.

The English colonies in America were distinct and separate communities, each of which had a government or political organization of its own. There was no such thing as a general organization or union, and no power to form one, although

some of the colonies acted together in the common defence, as against the Indians, and in the wars between England and France, which resulted, a few years before the Revolution, in establishing the dominion of the English over Canada and the Northwest. 1 Curtis' Const. Hist. U. S. 1–4; Lodge's Hist. Eng. Col. in Am. 351–352, 367–370; Scott's Development of Const. Liberty in English Colonies, 36.

Such being the nature of the colonial governments and the character of their existence, it was inevitable that they should treat each other as equals when they came to act together in resisting the encroachments of the English government, and achieving their own independence. The rule of voting by States, established at the outset, was continued by the Articles of Confederation, and was carried into the rules of the convention which framed the Constitution. 1 Elliot's Deb. 164. The Constitution itself made the separate and individual approval of nine of the States necessary, in order to its adoption at all, and made it possible for the new government to go into operation with four States left out, and each in the enjoyment of a separate independence.

Strenuous efforts were made in a number of the States to defeat a ratification of the Constitution, but it does not appear that the provisions for the election of the President and Vice President excited any particular animosity or were the subject of any serious controversy. Hamilton's statements in regard to these provisions, in the sixty-eighth number of the Federalist, seem to have reflected the general judgment, as they did, undoubtedly, his own opinion and that of Madison. From them it is evident that legislative appointments were not at that time contemplated; but the shortness of time allowed by Congress explains why that mode was adopted in some States at the first election.

This brief statement of the condition of things prior to and at the time of the adoption of the Constitution brings us to the consideration of the questions in discussion here; which are: (1) Does the Michigan statute contravene and is it repugnant to Art. II, sec. 1, clause 2, of the Constitution of the United States? (2) Does it contravene and was it repugnant

to the Fourteenth Amendment to the Constitution of the United States? (3) Is it in contradiction of and opposition to the act of Congress of February 3, 1887?

I. The Michigan statute is in conflict with Art. II, sec. 1, clause 2, of the Constitution of the United States, which provides that, "each State shall appoint, in such manner as the legislature thereof may direct, a number of electors equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress."

In legal effect it commands the State to "appoint" the electors, and delegates to the legislature the power to "direct" the manner of their appointment;" thus imposing one duty on the State and another on the legislature. We contend that the words "the State," as thus used, mean the artificial being, the legal entity, the body politic, which is the sovereign State.

Immediately preceding the present use of the word in the Constitution it had been repeatedly employed to designate the State in its sovereign capacity. Art. I, sec. 10, clause 1: "No State shall enter into any treaty, alliance or confederation," etc. Clause 2: "No State shall, without the consent of the United States, lay any imposts or duties," etc.; again: "And the net produce of all duties and imposts laid by any State," etc. Clause 3: "No State shall, without the consent of Congress, lay any duty of tonnage." Similar uses of the term in other parts of the Constitution suggest themselves, as Art. III, sec. 2, that "the judicial power shall extend to controversies between two or more States, . . . between a State and the citizens of another State, . . . between a State or' the citizens thereof and foreign States, citizens or subjects." Art. IV, sec. 3: "New States may be admitted into this Union."

Whenever the Constitution confers any power on or reserves any right to the people of the States or to any state functionaries, it is careful to so declare explicitly, as in the case of Art. I, sec. 2, for choosing representatives in Congress by the "people of the several States;" Art. I, sec. 3: choosing United States Senators "by the legislature" of the State.

Art. IV, sec. 2 : "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." Art. V: "On the application of the legislatures of two-thirds of the several States, Congress shall call a convention for proposing amendments to the Constitution." Finally, the Tenth Amendment provides "that the powers not delegated to the United States by the Constitution nor prohibited by it to the States are reserved respectively to the States or the people."

Strong support of this contention that the State must appoint its presidential electors is found in the third and immediately succeeding clause of the same section, afterwards superseded by the Twelfth Amendment, which provided that when the election of President is cast upon the House of Representatives "the votes shall be taken by States, the representative from each State having one vote," etc.

Nor are judicial interpretations lacking to sustain our contention. See *Hepburn* v. *Ellzey*, 2 Cranch, 445 ; *Penhallow* v. *Doane*, 3 Dall. 54 ; *Ware* v. *Hylton*, 3 Dall. 199, 225 ; *Buckner* v. *Finley*, 2 Pet. 586 ; and *Texas* v. *White*, 7 Wall. 700, where the court says, (p. 721,) "A State, in the ordinary sense of the Constitution, is a political community of free citizens, occupying a territory of definite boundaries and organized under the government's sanction and limited by a written constitution and established by the consent of the governed. It is the union of such States under a common Constitution which forms the distinct and greater political unit, which that Constitution designates as the United States, and makes of the people and States which compose it, one people and one country."

What the Constitution intends by the term "State" is the sovereign State, a legal although an artificial being, a great political corporation with imperial prerogatives and powers, the great State ; the State that in the minds of many of the men of the convention which framed the Constitution was greater almost than the United States ; the State of whose proper sovereignty they would not give up one jot or tittle ; a State which has a great seal ; which has a seat of govern-

ment; which has a system of courts to decide any controversy concerning an appointment; which has a military and civil power which can record its decree; and which from its high plane of sovereignty can command respect for its choice, and if its choice is not respected can command obedience to its will.

It is said that this clause of the Constitution provides that this appointment shall be made "in such manner as the legislature may direct," and it is claimed that these words are so plenary as to permit the legislature to take this great power from the sovereign State, and, cutting it up, divide it among fourteen disjointed fractions of the territory of the State, each of which shall choose one elector of President and Vice President of the United States. It is sufficient answer to this to say, that under the form of prescribing the manner in which the State shall appoint, the power is not conferred upon the legislature to deprive the State of all appointing power.

The Supreme Court of the State of Michigan, "admitting that if the question were to be determined solely by reference to the language employed, there would be much force in the contention that the State must act as a unit, and that no lesser body could be delegated to perform any portion of the duty vested in the State body corporate, and that it might possibly be held that the words 'in such manner as the legislature thereof may direct' confer only the limited power of directing how the State, acting as an entirety, shall make its appointment," held that the case was a proper one in which to have resort to contemporaneous construction, and reached the conclusion that such contemporaneous construction settled the legality of district electors.

We submit, with great deference, that that learned court was in error in this respect: (*a*) because the language of the Constitution is so plain, clear and determinate that it requires no interpretation; and (*b*) because there has, in fact, been no such interpretation.

(*a*). The rule as to interpretation is thus stated by Mr. Justice Story: "Where its words are plain, clear and determinate they require no interpretation, and it should therefore

be admitted, if at all, with great caution, and only from necessity, either to escape some absurd consequence, or to guard against some fatal evil. Where the words admit of two senses, each of which is conformable to common usage, that sense is to be adopted which, without departing from the literal import of the words, best harmonizes with the nature and objects, scope and design, of the instrument. Contemporary construction is properly resorted to to illustrate and confirm the text, to explain a doubtful phrase, or to expound an obscure clause; and in proportion to the uniformity and universality of that construction, and the known ability and talents of those by whom it was given, is the credit to which it is entitled. It can never abrogate the text, it can never fritter away its obvious sense, it can never narrow down its true limitations, it can never enlarge its natural boundaries." Now, in this case, as has already been said, the language is clear, and no interpretation is necessary.

(*b*) But even if it were otherwise, there has been no such continuous action as to amount to an interpretation. The mere fact that among the variant methods of appointing presidential electors, which came into practice a few years after the adoption of the Constitution, a few of the States did for a time choose electors by districts, is not evidence of any such contemporaneous construction as should conclude the court from giving the true and plain exposition of the text. On the contrary, the fact, which is historical, that all the States which had originally adopted a district system soon abandoned it, and that as early as 1834 presidential electors in every State in the Union were appointed by the State, being chosen either by the popular vote or by the legislature, is evidence that the real contemporaneous construction of this provision was adverse to the district plan.

In[1] the election of 1788, ten States participated. In five, the appointments were made by the legislatures. In two,

---

[1] In the briefs of counsel this subject is treated much at length, with full references to authorities. A brief summary is thought to be sufficient to make the general line of argument clear.

the electors were elected by the people on a general ticket. In two, the State was divided into congressional districts, in each of which two candidates for elector were chosen, from which the legislature elected one as an elector. In Virginia alone, were the electors elected separately in each district.

Fifteen States took part in the election of 1792. In nine the electors were chosen by the legislature. In three, they were elected by the people on a general ticket. In Virginia, as before, the electors were elected in separate districts, and Massachusetts and North Carolina adopted schemes partaking in part of the nature of an election by the people in districts, and in part of the nature of an election by the legislature.

In the election of 1796 sixteen States took part. In nine, the electors were appointed by the legislature. Two adhered to a popular election on a general ticket. Three adhered to the district system. Massachusetts adhered to its own system and Tennessee delegated the power to citizens named by the legislature.

In 1800 party strife ran high, and some changes were made and others attempted with a view to affect the general result. Massachusetts and Virginia gave up the district system and adopted that of electing by the legislature. Pennsylvania adopted a modified form of the latter system.

The action of the two populous States of Virginia and Massachusetts in abandoning the district method in the election of 1800, but for opposite political or party reasons, settled the fate of that method, and it was only a question of time when it would entirely disappear. The system of electing by general ticket was definitely adopted by North Carolina in 1812, Kentucky and Massachusetts in 1824, Indiana and Illinois in 1828, New York, Delaware, Tennessee, and Maine in 1832; and by Maryland in 1838. Since the presidential election of 1832, the district method has not been used by any State in the union.

This is an abandonment for sixty years; and when the reasons which led the States to this course are considered, it is certainly a most important and significant fact. The method of having the electors appointed by the concurrent or joint

vote of the two houses of the legislature of a State, was also abandoned as a part of the same evolution, and with nearly the same unanimity. South Carolina, with a legislature always fresh from the people, continued the practice until 1860. All the other States had abandoned the system by 1828, except Delaware, and it was abandoned there before 1832. During the reconstruction period, before all the Southern States had been re-admitted to Congress and the Union, Florida used the legislative method for a single election, that of 1868, the legislature and state officers having been elected in May, and no other state election being provided for until 1870. Colorado was admitted to the Union August 1, 1876, and a legislature and state officers were elected on the first Tuesday of October. To save the expense and trouble of another election, the legislature made the appointments for that year. The legislative appointments in Florida and Colorado were, therefore, provisional or temporary; and that method was resorted to because of the exceptional conditions, and not for the purpose of overcoming or overriding the political sentiments or preferences of a majority of the people in those States.

The district system of choosing electors was not obnoxious to the Constitution in its original object and purpose, for the reason that if that object and purpose had been attainable and had been actually accomplished, any division in the votes of the electors of a State, would have been the result of an exercise by each elector of his individual judgment and discretion, and not the result of the political will or partisan voice of the district by which he was chosen; but it is obnoxious to that plan as it was practically and ultimately developed, and as it has now for sixty years actually existed. The legislation establishing it in the early history of the nation took place in times of partisan excitement, and should have no more weight with a court as a construction of the Constitution than the law that we are discussing should have weight; for the legislation then was prompted by and born of the very same spirit of which this law is born, a mad desire for temporary power. There is no rule of constitutional interpretation, or of judicial duty, which requires the court, in determining the constitu-

tional validity of the district system, to adhere to the obsolete original design of the Constitution, and to disregard the plan of the electoral college as it actually exists, after a century of practical experience and development.

In the late Mr. Justice Miller's Lectures on the Constitution of the United States, p. 149, is the following: "As originally adopted, and as it now exists, it was supposed that the body of electors interposed between the state legislatures and the presidential office would exercise a reasonable independence and fair judgment in the selection of the chief executive of the national government, and that thus the evil of a President selected by immediate popular suffrage on the one side, and the opposite evil of an election by the direct vote of the States in their legislative bodies on the other, would both be avoided. A very short experience, however, demonstrated that these electors, whether chosen by the legislatures of the States, as they were originally, or by the popular suffrage of each State, as they have come to be now, or by limited districts in each State, as was at one time the prevailing system, are always but the puppets selected under a moral restraint to vote for some particular person who represented the preferences of the appointing power, whether that was the legislature or the more popular suffrage by which the legislature itself was elected. So that it has come to pass that this curious machinery is only a mode of casting the vote to which a State is entitled in the election of President in favor of that candidate who is the favorite of the majority of the people entitled to vote for the more popular branch of the state legislature in each State."

And in *In re Green,* 134 U. S. 377, 379, this court said, speaking through Mr. Justice Gray:

"The sole function of the presidential electors is to cast, certify and transmit the vote of the State for President and Vice President of the nation. Although the electors are appointed and act under and pursuant to the Constitution of the United States, they are no more officers or agents of the United States than are the members of the state legislatures when acting as electors of federal senators, or the people of

the States when acting as electors of representatives in Congress. Constitution, art. 1, sects. 2, 3.

"In accord with the provisions of the Constitution Congress has determined the time as of which the number of electors shall be ascertained, and the days on which they shall be appointed, and shall meet and vote in the States, and on which their votes shall be counted in Congress; has provided for the filling by each State, in such manner as its legislature may prescribe, of vacancies in its college of electors; and has regulated the manner of certifying and transmitting their votes to the seat of the national government, and the course of proceeding in their opening and counting them. Rev. Stat. §§ 131–143; Acts of February 3, 1887, c. 90, 24 Stat. 373; October 19, 1888, c. 1216, 25 Stat. 613.

"Congress has never undertaken to interfere with the manner of appointing electors, or, where (according to the general usage) the mode of appointment prescribed by the law of the State is election by the people, to regulate the conduct of such election, or to punish any fraud in voting for electors; but has left these matters to the control of the States."

II. The Michigan Statute is in violation of the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

The electoral system, as it actually exists, having been recognized by those amendments, the general ticket method for choosing presidential electors was thereby made the permanent and only constitutional method of appointment.

At the time of the adoption of those amendments in every State of the Union the male inhabitants thereof twenty-one years of age, and citizens of the United States, by express provision of law, possessed and exercised the right of voting at an election for the electors of President and Vice President of the United States, and the right of voting for all the electors of President and Vice President of the United States to which the State was entitled.

That this was a right and a privilege no one will deny; that it cannot be abridged by state legislation must be conceded.

The only question that remains is: does Act No. 50 of the Public Acts of 1891 deprive any citizen of the United States of twenty-one years of age, who is an inhabitant of Michigan, of his right to vote for electors of President and Vice President of the United States, or does it in any manner abridge this right?

Under the prior law every citizen of the United States who was a male inhabitant of Michigan and twenty-one years of age had the right to vote for as many electors of President and Vice President as the State was entitled to elect of Senators and Representatives in Congress. At the coming election in Michigan that would be fourteen. Under Act No. 50 no such citizen has the right to vote for more than two such electors. In other words, his right under the Fourteenth Amendment, if it is applicable, is to vote for fourteen electors of President and Vice President, while under Act No. 50 that right is so abridged that he can vote for but two. It is too plain for argument that if the amendment applies there is an abridgment, if not a denial, of this right.

I am not unmindful that this reasoning will render necessary the striking out of Article II, section 1, clause 2, of the Constitution, the words "in such manner as the legislature thereof may direct." Such, I believe, to be the effect of the amendment.

The electors of President and Vice President, under the amendment, must be chosen by the votes of the qualified citizens at an election for that purpose. There cannot be any other construction of the words "the right to vote at an election for the choice of electors of President and Vice President of the United States."

It cannot be said that if the voter votes for members of a legislature which chooses the electors, this will satisfy the amendment. The amendment gives him by its express terms the right to vote for "members of the legislature" and "electors of President and Vice President."

This right to vote for electors — not for one elector, not for as many as the legislature may name, but for all — this right which is specifically named, cannot be taken away by any subsequent act of a state legislature.

III. The Michigan statute is in-conflict with the act of Congress of February 3, 1887, 24 Stat. 373, c. 90. This will be seen by placing the two in parallel columns.

*Act of Congress.*

SEC. 1. Electors of each State to meet *on the second Monday in January* following their appointment.

SEC. 3 makes it the duty of the *Executive* of each State to communicate under the seal of the State to the Secretary of State of the United States a certificate of the ascertainment of the electors appointed setting forth their names, the canvass, and the number of *votes for each person for whose appointment any or all votes have been given or cast;* also *to deliver to the electors* of such State the same certificate in triplicate under the seal of the State. . . . Such certificate to the electors shall be inclosed and transmitted by the electors at the same time and in the same manner as is provided by law for the transmitting by such electors to the seat of government the lists of all persons voted for as President and of all persons voted for as Vice President.

*Act No. 50.*

SEC. 4. Electors shall convene . . . on *the first Wednesday in December* immediately following their election.

SEC. 3 makes it the duty of the *secretary of state* to prepare three lists of the names of the electors and alternate electors, procure thereto the signature of the governor, affix the seal of the State thereto, and deliver such certificates thus signed and sealed to one of the electors on or before the first Wednesday of December next following the election.

NOTE. — That no provision is made in the state act for sending any certificate to the Secretary of State of the United States or any other United States officials and no provision for making any statement of the number of votes given for any and all persons for whose appointment any votes were cast.

We understand it to be conceded that, in so far as it conflicts with the act of Congress, the state statute is void. We

contend that such a conflict in legislation invalidates the whole act. When an act of a state legislature, purporting to carry out a duty imposed on the State by the Constitution of the United States, directs certain officers of the State to do certain things, which the act of Congress passed in pursuance of the Constitution of the United States, commands other state officers to do and to perform in a different manner, the whole of the state law is illegal and void. The vice of the state law is that it is in hostility to the act of Congress. There is no presumption that the state law was passed in ignorance of the United States law. The legislature are presumed to know the laws of the United States governing state action.

*Mr. A. A. Ellis*, Attorney General of the State of Michigan, (with whom was *Mr. John W. Champlin* on the brief,) and *Mr. Otto Kirchner*, for defendant in error, said, on the question of jurisdiction :

I. The decision of the Supreme Court of the State of Michigan, refusing the mandamus prayed for, is not reviewable by this court, because: (*a*) The case does not fall within the 25th section of the Judiciary Act, Rev. Stat. § 709; and (*b*) The subject matter of this controversy is not of judicial cognizance.

(*a*) Under Rev. Stat. § 709 this court may review the final judgment or decree in any suit by the highest court of a State in the following cases only : (1) Where is drawn in question the validity of a statute of or an authority exercised under the United States, and the decision is against its validity; or (2) Where is drawn in question the validity of a statute of or authority exercised under any State on the ground of their being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of their validity; or (3) Where any title, right, privilege or immunity is claimed under the Constitution, or any treaty or statute of, or commission held, or authority exercised under the United States, and the decision is against the title, right, privilege or immunity specially set up or claimed by either party under such Constitution, treaty, statute, commission or authority.

*Ryan* v. *Thomas,* 4 Wall. 603 ; *Caperton* v. *Ballard,* 14 Wall. 238 ; *Simmerman* v. *Nebraska,* 116 U. S. 54.

The validity of the law in question is in no way involved in the application for the mandamus. There is nothing inconsistent between it and the statute under which the respondent, secretary of state, is required to act. It cannot, therefore, be claimed that the validity of a statute of the State of Michigan on the ground of its being repugnant to the Constitution, treaty or laws of the United States, is drawn in question in the mandamus proceeding. The case, therefore, is not within the second subdivision of § 25 of the Judiciary Act.

Neither can it be claimed that any right, privilege or immunity is claimed under the Constitution, or any treaty, or statute of, or commission held, or authority exercised under the United States, and that the decision of the Supreme Court of Michigan was against any such title, right, privilege or immunity. The case, therefore, is not within the last clause of § 25 of the Judiciary Act.

It cannot be contended that it is under the first subdivision of the section.

The duty of the secretary of state to give the statutory notice of the election was a public duty. But conceding, for the sake of argument, that a candidate for office at the next general election has a right under the statute to insist that notice of the election shall be given, and to enforce such right by mandamus; the right, if any, rests entirely upon the statute of the State of Michigan, and is in no way affected by the Constitution, or treaty, or statute, or commission held or authority exercised under the United States.

It is true that the Supreme Court of Michigan in passing upon the relators' right to the mandamus prayed for decided that the law did not conflict with any provision of the Federal Constitution, and that it was void only so far as it conflicted with the Act of Congress. But the expression by the state court of an opinion upon a Federal question does not give this court jurisdiction of the case unless it appears that it was necessary to pass upon the Federal question in order to decide the case; and if a decision might have been reached by the

state court without passing upon the Federal question this court will not take cognizance of the cause. Railroad Co. v. Rock, 4 Wall. 177; Lawler v. Walker, 14 How. 149; De Saussure v. Gaillard, 127 U. S. 216.

There are other grounds upon which the decision of the court refusing the mandamus might have been placed without touching any Federal question. A mandamus is not a writ of right in Michigan even when it is asked against a public officer to compel him to discharge a public duty. In all cases it is granted or refused in the sound discretion of the court. People v. Regents of the University of Michigan, 4 Michigan, 98; Mabley v. Superior Court Judge of Detroit, 41 Michigan, 31; Hale v. Risley, 69 Michigan, 596.

(b) The subject-matter of this controversy is not of judicial cognizance. Judicial power is, in its nature, necessarily exclusive. It does not trench upon the domain of any other department of the government. It will not allow any other department of the government to trench upon its domain. A matter is of judicial cognizance when the courts have power to dispose of it finally. Miller on the Constitution, 314; Hayburn's Case, 2 Dall. 408, 409, note; United States v. Ferreira, 13 How. 40; United States v. Yale Todd, 13 How. 52, note; In re Cooper, 143 U. S. 472.

Applying the principles of these decisions to the case at bar, we say that this controversy is not judicial, because whatever decision this court, or any other court, may make as to the validity of the state law, is subject to review by political officers and agencies. See Royce v. Goodwin, 22 Michigan, 496, and Sutherland v. The Governor, 29 Michigan, 320.

The legal status of the situation may be stated thus:

1. The canvass and final-determination as to who is elected to the office of elector rests with the board of state canvassers in the first instance. This decision is not subject to review or control by any court within the State of Michigan.

2. If the decision of the board of canvassers as to who is elected to the office of presidential elector is contested, the final decision of the controversy rests in the next place with the legislature of the State in joint convention. It cannot be

contended that the action of the legislature is subject to judicial review or control.

3. It then rests with the governor of the State, whose duty it is to certify the action of the state board of canvassers. He may have to decide between contending boards. The action of the governor, as we have already shown, is not subject to judicial review or control.

4. And, finally, the whole matter rests with both houses of the Congress of the United States.

It is manifest, therefore, that whatever decision the court may render in this case is not final, but is subject to review by the political agencies already referred to.

The object of this proceeding is not to determine whether the notice prayed for in the petition should be given, but to obtain a decision upon the validity of the State law. That decision is, as we have already seen, subject to review, and subject to be utterly disregarded by the various political agencies referred to.

II. This court is bound by the decision of the Supreme Court of Michigan as to all matters sought to be raised by the petition, except the question as to whether the state statute contravenes the Fourteenth Amendment to the Constitution.

The only conflict between the state statute and the act of Congress relates to the time of the meeting of the electors and the certification of their appointment. Wherever the state law and the act of Congress conflict, the latter of course controls. The Supreme Court of Michigan held that what remained of the state law was a valid expression of the legislative will within constitutional limitations. The validity of so much of the state statute as does not conflict with the act of Congress, barring the Federal question already referred to, is, we submit, a question of local law upon which the determination of the local tribunal is conclusive.

MR. CHIEF JUSTICE FULLER, after stating the case as above reported, delivered the opinion of the court.[1]

---

[1] The judgment of affirmance was entered as above stated October 17, 1892, and the mandate issued at once. The opinion was delivered and filed November 7, 1892.

The Supreme Court of Michigan held in effect that if the act in question were invalid, the proper remedy had been sought. In other words, if the court had been of opinion that the act was void, the writ of mandamus would have been awarded.

And, having ruled all objections to the validity of the act urged as arising under the state constitution and laws adversely to the plaintiffs in error, the court was compelled to, and did, consider and dispose of the contention that the act was invalid because repugnant to the Constitution and laws of the United States.

We are not authorized to revise the conclusions of the state court on these matters of local law, and those conclusions being accepted, it follows that the decision of the Federal questions is to be regarded as necessary to the determination of the cause. *DeSaussure* v. *Gaillard*, 127 U. S. 216.

Inasmuch as under section 709 of the Revised Statutes of the United States, we have jurisdiction by writ of error to re-examine and reverse or affirm the final judgment in any suit in the highest court of a State in which a decision could be had, where the validity of a statute of the State is drawn in question on the ground that it is repugnant to the Constitution and laws of the United States and the decision is in favor of its validity, we perceive no reason for holding that this writ was improvidently brought.

It is argued that the subject-matter of the controversy is not of judicial cognizance, because it is said that all questions connected with the election of a presidential elector are political in their nature; that the court has no power finally to dispose of them; and that its decision would be subject to review by political officers and agencies, as the state board of canvassers, the legislature in joint convention, and the governor, or, finally, the Congress.

But the judicial power of the United States extends to all cases in law or equity arising under the Constitution and laws of the United States, and this is a case so arising, since the validity of the state law was drawn in question as repugnant to such constitution and laws, and its validity was sustained.

*Boyd* v. *Thayer*, 143 U. S. 135.    And it matters not that the judgment to be reviewed may be rendered in a proceeding for mandamus.    *Hartman* v. *Greenhow*, 102 U. S. 672.

As we concur with the state court, its judgment has been affirmed; if we had not, its judgment would have been reversed.    In either event, the questions submitted are finally and definitively disposed of by the judgment which we pronounce, and that judgment is carried into effect by the transmission of our mandate to the state court.

The question of the validity of this act, as presented to us by this record, is a judicial question, and we cannot decline the exercise of our jurisdiction upon the inadmissible suggestion that action might be taken by political agencies in disregard of the judgment of the highest tribunal of the State as revised by our own.

On behalf of plaintiffs in error it is contended that the act is void because in conflict with (1) clause two of section one of Article II of the Constitution of the United States; (2) the Fourteenth and Fifteenth Amendments to the Constitution; and (3) the act of Congress of February 3, 1887.

The second clause of section one of Article II of the Constitution is in these words: " Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress; but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."

The manner of the appointment of electors directed by the act of Michigan is the election of an elector and an alternate elector in each of the twelve Congressional districts into which the State of Michigan is divided, and of an elector and an alternate elector at large in each of two districts defined by the act.    It is insisted that it was not competent for the legislature to direct this manner of appointment because the State is to appoint as a body politic and corporate, and so must act as a unit and cannot delegate the authority to subdivisions created for the purpose; and it is argued that the appoint-

ment of electors by districts is not an appointment by the State, because all its citizens otherwise qualified are not permitted to vote for all the presidential electors.

"A State in the ordinary sense of the Constitution," said Chief Justice Chase, *Texas* v. *White,* 7 Wall. 700, 721, "is a political community of free citizens, occupying a territory of defined boundaries, and organized under a government sanctioned and limited by a written constitution, and established by the consent of the governed." The State does not act by its people in their collective capacity, but through such political agencies as are duly constituted and established. The legislative power is the supreme authority except as limited by the constitution of the State, and the sovereignty of the people is exercised through their representatives in the legislature unless by the fundamental law power is elsewhere reposed. The Constitution of the United States frequently refers to the State as a political community, and also in terms to the people of the several States and the citizens of each State. What is forbidden or required to be done by a State is forbidden or required of the legislative power under state constitutions as they exist. The clause under consideration does not read that the people or the citizens shall appoint, but that "each State shall"; and if the words "in such manner as the legislature thereof may direct," had been omitted, it would seem that the legislative power of appointment could not have been successfully questioned in the absence of any provision in the state constitution in that regard. Hence the insertion of those words, while operating as a limitation upon the State in respect of any attempt to circumscribe the legislative power, cannot be held to operate as a limitation on that power itself.

If the legislature possesses plenary authority to direct the manner of appointment, and might itself exercise the appointing power by joint ballot or concurrence of the two houses, or according to such mode as designated, it is difficult to perceive why, if the legislature prescribes as a method of appointment choice by vote, it must necessarily be by general ticket and not by districts. In other words, the act of appointment is none the less the act of the State in its entirety because ar-

rived at by districts, for the act is the act of political agencies duly authorized to speak for the State, and the combined result is the expression of the voice of the State, a result reached by direction of the legislature, to whom the whole subject is committed.

By the first paragraph of section two, Article I, it is provided: "The House of Representatives shall be composed of Members chosen every second year by the people of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature;" and by the third paragraph "when vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." Section four reads: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators."

Although it is thus declared that the people of the several States shall choose the members of Congress, (language which induced the State of New York to insert a salvo as to the power to divide into districts, in its resolutions of ratification,) the state legislatures, prior to 1842, in prescribing the times, places and manner of holding elections for representatives, had usually apportioned the State into districts, and assigned to each a representative; and by act of Congress of June 25, 1842, 5 Stat. 491, c. 47, (carried forward as § 23 of the Revised Statutes), it was provided that where a State was entitled to more than one representative, the election should be by districts. It has never been doubted that representatives in Congress thus chosen represented the entire people of the State acting in their sovereign capacity.

By original clause three of section one of Article II, and by the Twelfth Amendment which superseded that clause, in case of a failure in the election of President by the people, the House of Representatives is to choose the President; and "the vote shall be taken by States, the representation from

each State having one vote." The State acts as a unit and its vote is given as a unit, but that vote is arrived at through the votes of its representatives in Congress elected by districts.

The State also acts individually through its electoral college, although, by reason of the power of its legislature over the manner of appointment, the vote of its electors may be divided.

The Constitution does not provide that the appointment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor that the majority of those who exercise the elective franchise can alone choose the electors. It recognizes that the people act through their representatives in the legislature, and leaves it to the legislature exclusively to define the method of effecting the object.

The framers of the Constitution employed words in their natural sense; and where they are plain and clear, resort to collateral aids to interpretation is unnecessary and cannot be indulged in to narrow or enlarge the text; but where there is ambiguity or doubt, or where two views may well be entertained, contemporaneous and subsequent practical construction are entitled to the greatest weight. Certainly, plaintiffs in error cannot reasonably assert that the clause of the Constitution under consideration so plainly sustains their position as to entitle them to object that contemporaneous history and practical construction are not to be allowed their legitimate force, and, conceding that their argument inspires a doubt sufficient to justify resort to the aids of interpretation thus afforded, we are of opinion that such doubt is thereby resolved against them, the contemporaneous practical exposition of the Constitution being too strong and obstinate to be shaken or controlled. *Stuart* v. *Laird*, 1 Cranch, 299, 309.

It has been said that the word "appoint" is not the most appropriate word to describe the result of a popular election. Perhaps not; but it is sufficiently comprehensive to cover that mode, and was manifestly used as conveying the broadest power of determination. It was used in Article V of the Articles of Confederation, which provided that "delegates shall be annually appointed in such manner as the legislature

of each State shall direct;" and in the resolution of Congress of February 21, 1787, which declared it expedient that "a convention of delegates who shall have been appointed by the several States," should be held. The appointment of delegates was, in fact, made by the legislatures directly, but that involved no denial of authority to direct some other mode. The Constitutional Convention, by resolution of September 17, 1787, expressed the opinion that the Congress should fix a day " on which electors should be appointed by the States which shall have ratified the same," etc., and that "after such publication, the electors should be appointed, and the Senators and Representatives elected."

The Journal of the Convention discloses that propositions that the President should be elected by " the citizens of the United States," or by the " people," or " by electors to be chosen by the people of the several States," instead of by the Congress, were voted down, (Jour. Con. 286, 288; 1 Elliot's Deb. 208, 262,) as was the proposition that the President should be " chosen by electors appointed for that purpose by the legislatures of the States," though at one time adopted. Jour. Con. 190; 1 Elliot's Deb. 208, 211, 217. And a motion to postpone the consideration of the choice " by the national legislature," in order to take up a resolution providing for electors to be elected by the qualified voters in districts, was negatived in Committee of the Whole. Jour. Con. 92; 1 Elliot's Deb. 156. Gerry proposed that the choice should be made by the State executives; Hamilton, that the election be by electors chosen by electors chosen by the people; James Wilson and Gouverneur Morris were strongly in favor of popular vote; Ellsworth and Luther Martin preferred the choice by electors elected by the legislatures; and Roger Sherman, appointment by Congress. The final result seems to have reconciled contrariety of views by leaving it to the state legislatures to appoint directly by joint ballot or concurrent separate action, or through popular election by districts or by general ticket, or as otherwise might be directed.

Therefore, on reference to contemporaneous and subsequent action under the clause, we should expect to find, as we do,

that various modes of choosing the electors were pursued, as, by the legislature itself on joint ballot; by the legislature through a concurrent vote of the two houses; by vote of the people for a general ticket; by vote of the people in districts; by choice partly by the people voting in districts and partly by the legislature; by choice by the legislature from candidates voted for by the people in districts; and in other ways, as, notably, by North Carolina in 1792, and Tennessee in 1796 and 1800. No question was raised as to the power of the State to appoint, in any mode its legislature saw fit to adopt, and none that a single method, applicable without exception, must be pursued in the absence of an amendment to the Constitution. The district system was largely considered the most equitable, and Madison wrote that it was that system which was contemplated by the framers of the Constitution, although it was soon seen that its adoption by some States might place them at a disadvantage by a division of their strength, and that a uniform rule was preferable.

At the first presidential election the appointment of electors was made by the legislatures of Connecticut, Delaware, Georgia, New Jersey and South Carolina. Pennsylvania, by act of October 4, 1788, Acts Penn. 1787–1788, p. 513, provided for the election of electors on a general ticket. Virginia, by act of November 17, 1788, was divided into twelve separate districts and an elector elected in each district, while for the election of Congressmen the State was divided into ten other districts. Laws Va. Oct. Sess. 1788, pp. 1, 2; 12 Henning's Stat. 648. In Massachusetts the general court, by resolve of November 17, 1788, divided the State into districts for the election of Representatives in Congress, and provided for their election December 18, 1788, and that at the same time the qualified inhabitants of each district should give their votes for two persons as candidates for an elector of President and Vice-President of the United States, and, from the two persons in each district having the greatest number of votes, the two houses of the general court by joint ballot should elect one as elector, and in the same way should elect two electors at large. Mass. Resolves, 1788, p. 53. In Maryland,

under act of December 22, 1788, electors were elected on general ticket, five being residents of the Western Shore and three of the Eastern Shore. Laws Md. 1788, Nov. Sess. c. 10. In New Hampshire an act was passed November 12, 1788, Laws N. H. 1789, p. 167, providing for the election of five electors by majority popular vote, and in case of no choice that the legislature should appoint out of so many of the candidates as equalled double the number of electors elected. There being no choice the appointment was made by the legislature. The senate would not agree to a joint ballot, and the house was compelled, that the vote of the State might not be lost, to concur in the electors chosen by the senate. The State of New York lost its vote through a similar contest. The assembly was willing to elect by joint ballot of the two branches or to divide the electors with the senate, but the senate would assent to nothing short of a complete negative upon the action of the assembly, and the time for election passed without an appointment. North Carolina and Rhode Island had not then ratified the Constitution.

Fifteen States participated in the second presidential election, in nine of which electors were chosen by the legislatures. Maryland, (Laws Md. 1790, c. 16, [2 Kelty]; Laws 1791, c. 62, [2 Kelty],) New Hampshire, (Laws N. H. 1792, 398, 401,) and Pennsylvania (Laws Penn. 1792, p. 240,) elected their electors on a general ticket, and Virginia by districts. Laws Va. 1792, p. 87, [13 Henning, 536]. In Massachusetts the general court by resolution of June 30, 1792, divided the State into four districts, in each of two of which five electors were elected, and in each of the other two three electors. Mass. Resolves, June, 1792, p. 25. Under the apportionment of April 13, 1792, North Carolina was entitled to ten members of the House of Representatives. The legislature was not in session and did not meet until November 15, while under the act of Congress of March 1, 1792, (1 Stat. 239, c. 8,) the electors were to assemble on December 5. The legislature passed an act dividing the State into four districts, and directing the members of the legislature residing in each district to meet on the 25th of November and choose three electors. 2 Iredell N.

Car. Laws, 1715 to 1800, c. 15 of 1792. At the same session an act was passed dividing the State into districts for the election of electors in 1796, and every four years thereafter. Id. c. 16.

Sixteen States took part in the third presidential election, Tennessee having been admitted June 1, 1796. In nine States the electors were appointed by the legislatures, and in Pennsylvania and New Hampshire by popular vote for a general ticket. Virginia, North Carolina, and Maryland elected by districts. The Maryland law of December 24, 1795, was entitled "An act to alter the mode of electing electors," and provided for dividing the State into ten districts, each of which districts should "elect and appoint one person, being a resident of the said district, as an elector." Laws Md. 1795, c. 73, [2 Kelty]. Massachusetts adhered to the district system, electing one elector in each Congressional district by a majority vote. It was provided that if no one had a majority, the legislature should make the appointment on joint ballot, and the legislature also appointed two electors at large in the same manner. Mass. Resolves, June, 1796, p. 12. In Tennessee an act was passed August 8, 1796, which provided for the election of three electors, "one in the district of Washington, one in the district of Hamilton, and one in the district of Mero," and, "that the said electors may be elected with as little trouble to the citizens as possible," certain persons of the counties of Washington, Sullivan, Green, and Hawkins were named in the act and appointed electors to elect an elector for the district of Washington; certain other persons of the counties of Knox, Jefferson, Sevier, and Blount were by name appointed to elect an elector for the district of Hamilton; and certain others of the counties of Davidson, Sumner, and Tennessee to elect an elector for the district of Mero. Laws Tenn. 1794, 1803, p. 109; Acts 2d Sess. 1st Gen. Assembly Tenn. c. 4. Electors were chosen by the persons thus designated.

In the fourth presidential election, Virginia, under the advice of Mr. Jefferson, adopted the general ticket, at least "until some uniform mode of choosing a President and Vice-President of the United States shall be prescribed by an amend-

ment to the Constitution." Laws Va. 1799, 1800, p. 3. Massachusetts passed a resolution providing that the electors of that State should be appointed by joint ballot of the senate and house. Mass. Resolves, June, 1800, p. 13. Pennsylvania appointed by the legislature, and upon a contest between the senate and house, the latter was forced to yield to the senate in agreeing to an arrangement which resulted in dividing the vote of the electors. 26 Niles' Reg. 17. Six States, however, chose electors by popular vote, Rhode Island supplying the place of Pennsylvania, which had theretofore followed that course. Tennessee, by act of October 26, 1799, designated persons by name to choose its three electors as under the act of 1796. Laws Tenn. 1794–1803, p. 211; Acts 2d Sess. 2d Gen. Ass. Tenn. c. 46.

Without pursuing the subject further, it is sufficient to observe that, while most of the States adopted the general ticket system, the district method obtained in Kentucky until 1824; in Tennessee and Maryland until 1832; in Indiana in 1824 and 1828; in Illinois in 1820 and 1824; and in Maine in 1820, 1824 and 1828. Massachusetts used the general ticket system, in 1804, (Mass. Resolves, June, 1804, p. 19,) chose electors by joint ballot of the legislature in 1808 and in 1816, (Mass. Resolves, 1808, pp. 205, 207, 209; 1816, p. 233;) used the district system again in 1812 and in 1820, (Mass. Resolves, 1812, p. 94; 1820, p. 245;) and returned to the general ticket system in 1824, (Mass. Resolves, 1824, p. 40.) In New York the electors were elected in 1828 by districts, the district electors choosing the electors at large. N. Y. Rev. Stat. 1827, Part I, Title vi, c. 6. The appointment of electors by the legislature, instead of by popular vote, was made use of by North Carolina, Vermont and New Jersey in 1812.

In 1824 the electors were chosen by popular vote, by districts, and by general ticket, in all the States excepting Delaware, Georgia, Louisiana, New York, South Carolina, and Vermont, where they were still chosen by the legislature. After 1832 electors were chosen by general ticket in all the States excepting South Carolina, where the legislature chose them up to and including 1860. Journals 1860, Senate pp. 12, 13; House, 11,

15, 17. And this was the mode adopted by Florida in 1868, (Laws 1868, p. 166,) and by Colorado in 1876, as prescribed by § 19 of the schedule to the constitution of the State, which was admitted into the Union August 1, 1876. Gen. Laws Colorado, 1877, pp. 79, 990.

Mr. Justice Story, in considering the subject in his Commentaries on the Constitution, and writing nearly fifty years after the adoption of that instrument, after stating that "in some States the legislatures have directly chosen the electors by themselves; in others, they have been chosen by the people by a general ticket throughout the whole State; and in others, by the people by electoral districts, fixed by the legislature, a certain number of electors being apportioned to each district," adds: "No question has ever arisen as to the constitutionality of either mode, except that by a direct choice by the legislature. But this, though often doubted by able and ingenious minds, (3 Elliot's Deb. 100, 101,) has been firmly established in practice ever since the adoption of the Constitution, and does not now seem to admit of controversy, even if a suitable tribunal existed to adjudicate upon it." And he remarks that "it has been thought desirable by many statesmen to have the Constitution amended so as to provide for a uniform mode of choice by the people." Story Const. 1st Ed. § 1466.

Such an amendment was urged at the time of the adoption of the Twelfth Amendment, the suggestion being that all electors should be chosen by popular vote, the States to be divided for that purpose into districts. It was brought up again in Congress in December, 1813, but the resolution for submitting the amendment failed to be carried. The amendment was renewed in the House of Representatives in Decem-

---

[1] See Stanwood on Presidential Elections, (3d ed.,) and Appleton's Presidential Counts, *passim;* 2 Lalor's Encyclo. Pol. Science, 68; 4 Hild. Hist. U. S., (Rev. Ed.,) 39, 382, 689; 5 Id. 389, 531; 1 Schouler's Hist. U. S. 72, 334; 2 Id. 184; 3 Id. 313, 439; 2 Adams' Hist. U. S. 201; 4 Id. 285; 6 Id. 409, 413; 9 Id. 139; 1 McMaster's Hist. People U. S. 525; 2 Id. 85, 509; 3 Id. 188, 189, 194, 317; 2 Scharf's Hist. Md. 547; 2 Bradford's Mass. 335; Life of Plumer, 104; 3 Niles' Register, 160; 5 Id. 372; 9 Id. 319, 349; 10 Id. 45, 177, 409; 11 Id. 296.

ber, 1816, and a provision for the division of the States into
single districts for the choice of electors received a majority
vote, but not two-thirds. Like amendments were offered in
the Senate by Messrs. Sanford of New York, Dickerson of
New Jersey and Macon of North Carolina. December 11,
1823, Senator Benton introduced an amendment providing that
each legislature should divide its State into electoral districts,
and that the voters of each district "should vote, in their own
proper persons," for President and Vice-President, but it was
not acted upon. December 16, and December 24, 1823,
amendments were introduced in the Senate by Messrs. Dicker-
son of New Jersey and Van Buren of New York, requiring
the choice of electors to be by districts; but these and others
failed of adoption, although there was favorable action in that
direction by the Senate in 1818, 1819 and 1822. December
22, 1823, an amendment was introduced in the House by Mr.
McDuffie of South Carolina, providing that electors should be
chosen by districts assigned by the legislatures, but action was
not taken.[1] The subject was again brought forward in 1835,
1844, and subsequently, but need not be further dwelt upon,
except that it may be added that, on the 28th of May, 1874, a
report was made by Senator Morton, chairman of the Senate
Committee on Privileges and Elections, recommending an
amendment dividing the States into electoral districts, and
that the majority of the popular vote of each district should
give the candidate one presidential vote, but this also failed
to obtain action. In this report it was said : " The appoint-
ment of these electors is thus placed absolutely and wholly
with the legislatures of the several States. They may be
chosen by the legislature, or the legislature may provide
that they shall be elected by the people of the State at
large, or in districts, as are members of Congress, which was
the case formerly in many States; and it is, no doubt, com-
petent for the legislature to authorize the governor, or the

---

[1] 1 Benton's Thirty Years View, 37; 5 Bent. Cong. Deb. 110, 677; 7 Id.
472-74, 600; 3 Niles' Reg. 240, 334; 11 Id. 258, 274, 293, 349; Annals Cong.,
(1812-13,) 847.

Supreme Court of the State, or any other agent of its will, to appoint these electors. This power is conferred upon the legislatures of the States by the Constitution of the United States, and cannot be taken from them or modified by their State constitutions any more than can their power to elect Senators of the United States. Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated." Senate Rep. 1st Sess. 43 Cong. No. 395.

From this review, in which we have been assisted by the laborious research of counsel, and which might have been greatly expanded, it is seen that from the formation of the government until now the practical construction of the clause has conceded plenary power to the state legislatures in the matter of the appointment of electors.

Even in the heated controversy of 1876–1877 the electoral vote of Colorado cast by electors chosen by the legislature passed unchallenged; and our attention has not been drawn to any previous attempt to submit to the courts the determination of the constitutionality of state action.

In short, the appointment and mode of appointment of electors belong exclusively to the States under the Constitution of the United States. They are, as remarked by Mr. Justice Gray in *In re Green*, 134 U. S. 377, 379, "no more officers or agents of the United States than are the members of the state legislatures when acting as electors of Federal senators, or the people of the States when acting as the electors of representatives in Congress." Congress is empowered to determine the time of choosing the electors and the day on which they are to give their votes, which is required to be the same day throughout the United States, but otherwise the power and jurisdiction of the State is exclusive, with the exception of the provisions as to the number of electors and the ineligibility of certain persons, so framed that Congressional and Federal influence might be excluded.

The question before us is not one of policy but of power, and

while public opinion had gradually brought all the States as matter of fact to the pursuit of a uniform system of popular election by general ticket, that fact does not tend to weaken the force of contemporaneous and long continued previous practice when and as different views of expediency prevailed. The prescription of the written law cannot be overthrown because the States have latterly exercised in a particular way a power which they might have exercised in some other way. The construction to which we have referred has prevailed too long and been too uniform to justify us in interpreting the language of the Constitution as conveying any other meaning than that heretofore ascribed, and it must be treated as decisive.

It is argued that the district mode of choosing electors, while not obnoxious to constitutional objection, if the operation of the electoral system had conformed to its original object and purpose, had become so in view of the practical working of that system. Doubtless it was supposed that the electors would exercise a reasonable independence and fair judgment in the selection of the Chief Executive, but experience soon demonstrated that, whether chosen by the legislatures or by popular suffrage on general ticket or in districts, they were so chosen simply to register the will of the appointing power in respect of a particular candidate. In relation, then, to the independence of the electors the original expectation may be said to have been frustrated. Miller on Const. Law, 149; Rawle on Const. 55; Story Const. § 1473; The Federalist, No. 68. But we can perceive no reason for holding that the power confided to the States by the Constitution has ceased to exist because the operation of the system has not fully realized the hopes of those by whom it was created. Still less can we recognize the doctrine, that because the Constitution has been found in the march of time sufficiently comprehensive to be applicable to conditions not within the minds of its framers, and not arising in their time, it may, therefore, be wrenched from the subjects expressly embraced within it, and amended by judicial decision without action by the designated organs in the mode by which alone amendments can be made.

Nor are we able to discover any conflict between this act and the Fourteenth and Fifteenth Amendments to the Constitution. The Fourteenth Amendment provides:

"SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

"SECTION 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

The first section of the Fifteenth Amendment reads: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude."

In *The Slaughter-house Cases*, 16 Wall. 36, this court held that the first clause of the Fourteenth Amendment was primarily intended to confer citizenship on the negro race; and, secondly, to give definitions of citizenship of the United States; and citizenship of the States, and it recognized the distinction between citizenship of a State and citizenship of the United States by those definitions; that the privileges and immunities of citizens of the States embrace generally those fundamental civil rights for the security and establishment of which organ-

ized society was instituted, and which remain, with certain exceptions mentioned in the Federal Constitution, under the care of the State governments; while the privileges and immunities of citizens of the United States are those which arise out of the nature and essential character of the national government, the provisions of its Constitution, or its laws and treaties made in pursuance thereof; and that it is the latter which are placed under the protection of Congress by the second clause of the Fourteenth Amendment.

We decided in *Minor* v. *Happersett*, 21 Wall. 162, that the right of suffrage was not necessarily one of the privileges or immunities of citizenship before the adoption of the Fourteenth Amendment, and that that amendment does not add to these privileges and immunities, but simply furnishes an additional guaranty for the protection of such as the citizen already has; that at the time of the adoption of that amendment, suffrage was not coextensive with the citizenship of the State; nor was it at the time of the adoption of the Constitution; and that neither the Constitution nor the Fourteenth Amendment made all citizens voters.

The Fifteenth Amendment exempted citizens of the United States from discrimination in the exercise of the elective franchise on account of race, color or previous condition of servitude. The right to vote in the States comes from the States, but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the United States, but the last has been. *United States* v. *Cruikshank*, 92 U. S. 542; *United States* v. *Reese*, 92 U. S. 214.

If because it happened, at the time of the adoption of the Fourteenth Amendment, that those who exercised the elective franchise in the State of Michigan were entitled to vote for all the presidential electors, this right was rendered permanent by that amendment, then the second clause of Article II has been so amended that the States can no longer appoint in such manner as the legislatures thereof may direct; and yet no such result is indicated by the language used nor are the amendments necessarily inconsistent with that clause. The first

section of the Fourteenth Amendment does not refer to the exercise of the elective franchise, though the second provides that if the right to vote is denied or abridged to any male inhabitant of the State having attained majority, and being a citizen of the United States, then the basis of representation to which each State is entitled in the Congress shall be proportionately reduced. Whenever presidential electors are appointed by popular election, then the right to vote cannot be denied or abridged without invoking the penalty, and so of the right to vote for representatives in Congress, the executive and judicial officers of a State, or the members of the legislature thereof. The right to vote intended to be protected refers to the right to vote as established by the laws and constitution of the State. There is no color for the contention that under the amendments every male inhabitant of the State being a citizen of the United States has from the time of his majority a right to vote for presidential electors.

The object of the Fourteenth Amendment in respect of citizenship was to preserve equality of rights and to prevent discrimination as between citizens, but not to radically change the whole theory of the relations of the state and Federal governments to each other, and of both governments to the people. *In re Kemmler*, 136 U. S. 436.

The inhibition that no State shall deprive any person within its jurisdiction of the equal protection of the laws was designed to prevent any person or class of persons from being singled out as a special subject for discriminating and hostile legislation. *Pembina Company* v. *Pennsylvania*, 125 U. S. 181, 188.

In *Hayes* v. *Missouri*, 120 U. S. 68, 71, Mr. Justice Field, speaking for the court, said: "The Fourteenth Amendment to the Constitution of the United States does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed. As we said in *Barbier* v. *Connolly*, speaking of the Fourteenth Amendment: 'Class legislation, discriminating against some

and favoring others, is prohibited; but legislation which in carrying out a public purpose is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.' 113 U. S. 237."

If presidential electors are appointed by the legislatures, no discrimination is made; if they are elected in districts where each citizen has an equal right to vote the same as any other citizen has, no discrimination is made. Unless the authority vested in the legislatures by the second clause of section 1 of Article II has been divested and the State has lost its power of appointment, except in one manner, the position taken on behalf of relators is untenable, and it is apparent that neither of these amendments can be given such effect.

The third clause of section 1 of Article II of the Constitution is : " The Congress may determine the time of choosing the Electors, and the day on which they shall give their votes; which day shall be the same throughout the United States."

Under the act of Congress of March 1, 1792, 1 Stat. 239, c. 8, it was provided that the electors should meet and give their votes on the first Wednesday in December at such place in each State as should be directed by the legislature thereof, and by act of Congress of January 23, 1845, 5 Stat. 721, c. 2, that the electors should be appointed in each State on the Tuesday next after the first Monday in the month of November in the year in which they were to be appointed; provided that each State might by law provide for the filling of any vacancies in its college of electors when such college meets to give its electoral vote; and provided that when any State shall have held an election for the purpose of choosing electors and has failed to make a choice on the day prescribed, then the electors may be appointed on a subsequent day in such manner as the State may by law provide. These provisions were carried forward into sections 131, 133, 134, and 135 of the Revised Statutes. Rev. Stat. Title III, c. 1, p. 22.

By the act of Congress of February 3, 1887, entitled " An act to fix the day for the meeting of the electors of President and Vice President," etc., 24 Stat. 373, c. 90, it was provided that the electors of each State should meet and give their

votes on the second Monday in January next following their appointment. The state law in question here fixes the first Wednesday of December as the day for the meeting of the electors, as originally designated by Congress. In this respect it is in conflict with the act of Congress, and must necessarily give way. But this part of the act is not so inseparably connected in substance with the other parts as to work the destruction of the whole act. Striking out the day for the meeting, which had already been otherwise determined by the act of Congress, the act remains complete in itself, and capable of being carried out in accordance with the legislative intent. The state law yields only to the extent of the collision. Cooley Const. Lim. *178; *Commonwealth* v. *Kimball*, 24 Pick. 359; *Houston* v. *Moore*, 5 Wheat. 1, 49. The construction to this effect by the state court is of persuasive force, if not of controlling weight.

We do not think this result affected by the provision in act No. 50 in relation to a tie vote. Under the constitution of the State of Michigan, in case two or more persons have an equal and the highest number of votes for any office, as canvassed by the board of state canvassers, the legislature in joint convention chooses one of these persons to fill the office. This rule is recognized in this act, which also makes it the duty of the governor in such case to convene the legislature in special session for the purpose of its application, immediately upon the determination by the board of state canvassers.

We entirely agree with the Supreme Court of Michigan that it cannot be held as matter of law that the legislature would not have provided for being convened in special session but for the provision relating to the time of the meeting of the electors contained in the act; and are of opinion that that date may be rejected and the act be held to remain otherwise complete and valid.

And as the State is fully empowered to fill any vacancy which may occur in its electoral college, when it meets to give its electoral vote, we find nothing in the mode provided for anticipating such an exigency which operates to invalidate the law.

We repeat that the main question arising for consideration is one of power and not of policy, and we are unable to arrive at any other conclusion than that the act of the legislature of Michigan of May 1, 1891, is not void as in contravention of the Constitution of the United States for want of power in its enactment.

The judgment of the Supreme Court of Michigan must be

*Affirmed.*