**H. D. DARBY, on behalf of himself and others similarly situated, Plaintiffs,**

**v.**

**James DANIEL, Circuit Clerk of Jefferson Davis County, Mississippi, and Joe T. Patterson, Attorney General of the State of Mississippi, Defendants.**

**Civ. A. 2748.**

United States District Court
S. D. Mississippi,
Jackson Division.

Nov. 6, 1958.

R. Jess Brown, Vicksburg, Miss., Robt. L. Carter, New York City, Constance B. Motley and Thurgood Marshall, New York City, for plaintiffs.

R. G. Livingston, Prentiss, Miss., Joe T. Patterson, Atty. Gen., and Dugas Shands and John H. Price, Jr., Assts. to the Atty. Gen., for defendants.

Before CAMERON, Circuit Judge, and MIZE and CLAYTON, District Judges.

CAMERON, Circuit Judge.

The case before us, with some of the facts, is thus stated in plaintiff's brief: "This is an action for a declaratory judgment and injunction brought by plaintiff on behalf of himself and others similarly situated. The gravamen of plaintiff's complaint is that he and other Negro citizens of Jefferson Davis County, Mississippi have been denied the right to

register in order that they might vote, solely because of their race and color, through the enforcement of a policy of discrimination against Negro voters, the enforcement of unconstitutional voting requirements, and the discriminatory administration of valid requirements. The plaintiff also seeks to enjoin enforcement of a state statute which makes it a crime, punishable by imprisonment for one year, for him to accept financial and legal assistance in the prosecution of this action and for his attorneys and others to give such assistance."

"The plaintiff in this case is an adult Negro citizen of the United States and of the State of Mississippi, residing in Prentiss, Jefferson Davis County, Mississippi, since 1947. He is not an idiot, an insane person, or an Indian who is not taxed, and is more than twenty-one years of age. His occupation is that of a minister of the Gospel. He has never been convicted of any crime enumerated in the Mississippi Constitution as grounds for disqualification as a voter. He has paid his poll tax for the years 1956 and 1957. He was a duly qualified and registered voter of Jefferson Davis County prior to January 1, 1954, and exercised his right to vote in various elections held in the county between 1950 and 1955, having registered for the first time in the early part of 1950.

"In 1954 the Legislature of the State of Mississippi proposed that Section 244 of the Mississippi Constitution of 1890 be amended, and after the proposed amendment was ratified by a vote of the electorate, it became law in 1955." Defendant Daniels was and is Circuit Clerk and Registrar of Jefferson Davis County and will be referred to as defendant unless otherwise noted.

The qualifications of Electors are set forth in Article 12 of the Mississippi Constitution of 1890 as amended, titled "Franchise," and the article embraces Sections 240–253, inclusive.

The Sections of the Article, other than Section 244 which is challenged by plaintiff, grant the right to vote to inhabitants of the state, except idiots, insane persons and Indians not taxed, who are citizens of the United States, twenty-one years old or over, with certain residence requirements, who have duly registered as provided in the article and who have never been convicted of certain listed crimes and who have paid all poll taxes legally required of them before February 1st of the year in which they offer to vote. Section 249 provides: "And registration under the Constitution and laws of this state by the proper officers of this state is hereby declared to be an essential and necessary qualification to vote at any and all elections."

Section 244 of Article 12, prior to the amendment attacked, was in these words:

> "Section 244. On and after the first day of January, A.D. 1892, every elector shall, in addition to the foregoing qualifications, be able to read any section of the Constitution of this state; or he shall be able to understand the same when read to him, or give a reasonable interpretation thereof. A new registration shall be made before the next ensuing election after January the first, A.D. 1892."

Amended Section 244 [1] reads as follows in its pertinent portions:

> "Section 244. Every elector shall, in addition to the foregoing qualifications be able to read and write any section of the Constitution of this State and give a reasonable interpretation thereof to the county registrar. He shall demonstrate to the county registrar a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government."

Following the quoted language the amended section goes on to provide that a person applying to register shall make

1. In 1954 the Legislature of Mississippi proposed that Section 244 of the Constitution of 1890 be amended, and after the proposed amendment was ratified by a vote of the people it became a part of the Constitution in 1955.

a sworn written application on a form to be prescribed by the State Board of Election Commissioners, and concludes with these words:

> "Any new or additional qualifications herein imposed shall not be required of any person who was a duly registered and qualified elector of this state prior to January 1, 1954. The Legislature shall have the power to enforce the provisions of this section by appropriate legislation."

In February, 1956 the Board of Supervisors of Jefferson Davis County ordered a new registration and due notice thereof was given by publication as required by law. This new registration was in line with the practice which had been followed in the county for a number of years, new registrations having been had in the years 1906, 1923, 1934 and 1949.

Defendant Daniel first became Circuit Clerk and Registrar of Jefferson Davis County January 1, 1956. Without dispute and based upon his opinion that, since a new registration had been ordered and forms had been sent to him by the State Election Commissioners, he was so obligated, he began the practice of requiring all applicants, regardless of color, to take the examination provided by the amendment and covered by the questionnaire, which policy he pursued until about October 15, 1956. Plaintiff Darby first entered his office to register on June 29, 1956, and defendant Daniel handed him the questionnaire to be completed pursuant to the custom then universally followed by him. No discussion was had between plaintiff and defendant. Plaintiff completed a part of the written examination and signed his name and left.

He had consulted the attorney now representing him and had written a letter of complaint to the President of the United States some weeks before that, which resulted in an investigation of defendant Daniel being made by the Federal Bureau of Investigation. About October 1, 1956 defendant Daniel received a letter from the United States Attorney in Jackson, Mississippi requesting that Daniel come to his office for conference. He responded to the request, going in company with the county attorney to the office of the United States Attorney. There he was advised that the Department of Justice took the position that persons who, like plaintiff Darby, had been registered prior to January 1, 1954 were required to take only the oral examination covering the qualifications as set forth in the original Section 244 of Article 12 of the Mississippi Constitution. Daniel left the United States Attorney and went to the Attorney General of Mississippi, who advised him in writing October 12, 1956, that no person registered prior to January 1, 1954 was *required* to take the written examination provided by the amendment. Thereafter, Daniel pursued the policy of giving all applicants of Darby's class the option to take the oral examination provided by the original section or the written examination provided by the amendment.

About November 2, 1956 plaintiff Darby again presented himself for registration and was given the oral examination. He did not pass in the opinion of Daniel and was so advised. Neither Darby nor Daniel remembered what section of the Constitution Darby was called upon to interpret. About June 8, 1957, Darby came to Daniel's office again to register and was given the oral examination, and again failed to pass. A short time thereafter the F. B. I. made a further examination into Daniel's operation of his office in which Daniel explained freely what happened.

■ On June 22, 1957, plaintiff Darby again presented himself to defendant Daniel, this time requesting that he be given the written examination as provided by the amendment. Without dispute, plaintiff followed this course on the advice of his attorney, whom he had first consulted more than a year before. He was given the written examination on the forms furnished to Daniel by the state

officials, and again Daniel ruled that he had not qualified for registration.[2]

Plaintiff Darby appealed, as provided by law, from the ruling of defendant Daniel rejecting his written application (he had not appealed from the other three rejections), and the evidence shows that in so doing he was guided by one of his attorneys of record who had been employed by the N.A.A.C.P. Legal Defense and Educational Fund. His attorney filed with the Registrar a writing bearing the heading "Appellant's Contentions."[3] Plaintiff Darby and his attorney appeared at the office of Daniel on October 7, 1957, but there was no meeting of the Commissioners scheduled or held at that time.[4] Said plaintiff and his attorney

2. After the Court had concluded the hearing of this action July 22–25, 1958, Rutha Dillon presented a "Motion to Intervene" served and filed September 16, 1958, setting forth that she had testified as a witness for plaintiff Darby and that her interest "may not be adequately represented by plaintiff and applicant may be bound by a judgment in this action." The application was filed by the attorneys already representing plaintiff Darby and with it was filed a memorandum brief in which she claimed that she was filing the application under Rule 20(a) and Rule 24(b) (2), Fed.Rules Civ.Proc. 28 U.S.C.A. Her application asked that she be permitted to intervene upon her testimony already given and upon the testimony introduced at the hearing. Her desire to intervene was grounded on her apprehension that plaintiff Darby might not represent her inasmuch as she had not registered prior to January 1, 1954, whereas Darby had registered prior to that time and had requested and taken the written examination provided by the amendment to Section 244, although not required so to do.

The defendants resisted the requested intervention, taking the position that the application came too late and that plaintiff Darby, having volunteered to take an examination he was not required to take, was not in position to maintain the action brought by him. The amendment provides that Darby should not be "required" to submit to its terms, but contains no prohibition against his voluntarily doing so. Both he and defendant Daniel proceeded in the written examination before us in obedience to the terms of the amendment, and we do not pause to resolve this question, arising as it does after all of the briefs have been submitted and much study given to the fundamental issues involved.

We see no harm to ensue from granting the application to intervene and have entered an order permitting the requested intervention upon the terms set forth. The intervenor will be referred to hereafter as a plaintiff.

3. This document set forth that plaintiff Darby had appealed to the Board of Commissioners within five days from the refusal of Defendant Daniel to register him; that Section 244 of the Mississippi Constitution as amended "is unconstitutional and void on its face since it bestows upon the registrar of voters an *uncontrolled discretion to determine* who is able to interpret the Constitution of the State of Mississippi and who is able to demonstrate an understanding of the duties and obligations of citizenship in a democratic form of government," said allegation being applied also to the Mississippi statutes implementing the constitutional provision. The document further set up that the constitutional and statutory provisions "are unconstitutional and void because the purpose of said provisions was to enable the registrar of voters to discriminate against otherwise qualified Negroes, solely because of their race and color," and that said provisions were being administered by defendant Daniel "in such a manner as to discriminate against Reverend H. D. Darby and other Negroes otherwise qualified, solely because of their race and color." The document further contended that since plaintiff Darby had registered prior to January 1, 1954, the new provisions were not applicable to him.

4. This appearance by plaintiff Darby and his attorney resulted, no doubt, from the language of Section 3226 of the Mississippi Code of 1942 providing that the Commissioners should meet "on the first Monday in October after appointment." The Commissioners had been appointed in 1956 and had held the October meeting that year. No provision being made in that section for meeting in any year except that of their appointment, the Mississippi Legislature in 1938 passed a statute appearing as Section 3240 of the Mississippi Code of 1942 providing that: "On the Tuesday after the third Monday in March, 1939, A. D. and *every year thereafter* the commissioners of election shall meet at the office of the registrar * * *" (Emphasis added.)

were advised that the Commissioners would meet at the Registrar's office on the Tuesday after the third Monday in March, 1958; plaintiff Darby testified that Daniel told them of a March meeting. No provision is made for notice to persons desiring to present contests of the actions of the Registrar and we do not find that defendant Daniel made any agreement to give any notice to plaintiff or that such an agreement, if made, would have any legal effect. The appeal, apparently begun as a test of the provisions of the Constitution and Statutes here under attack, was not prosecuted, but this civil action was filed four days before the Election Commissioners met in Jefferson Davis County. The appeal is still pending before them.

Other portions of the testimony will be referred to under the discussion of the several points raised by the parties.

From the written contentions so filed on the appeal, the averments of the Complaint and plaintiff's brief it appears that the attack on the Mississippi Constitution and implementing statutes is based upon three grounds: that Section 244 is unconstitutional and void on its face because it bestows upon the Registrar "an uncontrolled discretion to determine who is able to interpret the Constitution of * * * Mississippi" and who is able to demonstrate an understanding of the duties of citizenship; that the section is unconstitutional and void because the purpose of said provisions was to enable the registrars to "discriminate against otherwise qualified Negroes;" and that said section is being administered "in such a manner as to discriminate against Reverend H. D. Darby and other Negroes otherwise qualified, solely because of their race and color."

The complaint specifies that the uncontrolled discretion referred to results from the amendment's vague and uncertain language "which fails to set up a standard of reasonableness capable of objective measurement." The precise prayer of the complaint asks an injunction "restraining defendant from enforcing those parts of said constitutional and statutory provisions which require an elector to give to defendant a 'reasonable interpretation' of a provision of the Constitution of the State of Mississippi and which require that an elector demonstrate to defendant a 'reasonable' understanding of the duties and obligations of citizens under a constitutional form of government." The allegations of unconstitutionality are predicated upon the due process clause of the Fourteenth Amendment and the provisions of the Fifteenth Amendment.

I

(1) Any consideration of the constitutionality of the challenged portions of this amendment begins with the fundamental fact that, under our constitutional system, the qualification of voters is a matter committed exclusively to the States. The Supreme Court has spoken on the subject in language as clear as it is decisive. Witness, for example, what it said in Pope v. Williams, 1904, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817:[5]

"The privilege to vote in any state is not given by the Federal Constitution, or by any of its amendments. It is not a privilege springing from citizenship of the United States. Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627. It may not be refused on account of race, color, or previous condition of servitude, but it does not follow from mere citizenship of the United States. In other words, *the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper* * * * The state might provide that persons of foreign birth could vote without being naturalized, and, as stated by Mr. Chief Justice Waite in Minor v. Happersett, [supra] such persons were allowed to vote in several of the states upon having declared their intentions to be-

5. The Court was then composed of Chief Justice Fuller and Associate Justices Harlan, Brewer, Brown, White, Peckham, McKenna, Holmes and Day, and the decision was unanimous.

come citizens of the United States. Some states permit women to vote; others refuse them that privilege. A state, so far as the Federal Constitution is concerned, might provide by its own constitution and laws that none but native-born citizens should be permitted to vote, as the Federal Constitution does not confer the right of suffrage upon any one, and the conditions under which that right is to be exercised *are matters for the states alone to prescribe,* subject to the conditions of the Federal Constitution, already stated; * * *. The *question whether the conditions prescribed by the state might be regarded by others as reasonable or unreasonable is not a Federal one.* * * *

"* * * The right of a state to legislate upon the subject of the elective franchise as to it may seem good, subject to the conditions already stated, being, as we believe, unassailable, we think it plain that the statute in question violates no right protected by the Federal Constitution.

*"The reasons which may have impelled the state legislature to enact the statute in question were matters entirely for its consideration, and this court has no concern with them."* 193 U.S. at pages 632–634, 24 S.Ct. at page 575. (Emphasis added.)

Like language was used by the Court in a case so much relied upon by plaintiffs, Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340. In striking down the Grandfather Clause of the Oklahoma Constitution, O.S.1951 Const. art. 3, § 4a the Court fixed its eyes upon certain principles as the lodestar which should furnish the light by which it would be guided:

> "* * * It (the United States) says state power to provide for suffrage is not disputed, although, of course, the authority of the 15th Amendment and the limit on that power which it imposes is insisted upon. Hence, no assertion denying the right of a state to exert judgment and discretion in fixing the qualification of suffrage is advanced, and no right to question the motive of the state in establishing a standard as to such subjects under such circumstances, or to review or supervise the same, is relied upon, and no power to destroy an otherwise valid exertion of authority *upon the mere ultimate operation of the power exercised is asserted.* And applying these principles to the very case in hand, the argument of the government in substance says: No question is raised by the government *concerning the validity of the literacy test provided for in the amendment under consideration as an independent standard since the conclusion is plain that that test rests on the exercise of state judgment, and therefore cannot be here assailed either by disregarding the state's power to judge on the subject, or by testing its motive in enacting the provision.* 238 U.S. at pages 359–360, 35 S.Ct. at page 929.
>
> * * * * * *
>
> "Beyond doubt the Amendment does not take away from the state governments in a general sense the power over suffrage which has belonged to those governments from the beginning, and *without the possession of which power the whole fabric upon which the division of state and national authority under the Constitution and the organization of both governments rest would be without support, and both the authority of the nation and the State would fall to the ground.* In fact, the very command of the Amendment recognizes the possession of the general power by the state, since the Amendment seeks to regulate its exercise as to the particular subject with which it deals." 238 U.S. at page 362, 35 S.Ct. at page 930.

(Emphasis added.)[6]

6. To the same effect see In re Slaughter-house Cases, 1873, 16 Wall. 36, 21 L. Ed. 394; Minor v. Happersett, 1874, 21 Wall. 162, 88 U.S. 162, 22 L.Ed. 627;

(2) Plaintiffs base their argument that the constitutional provisions under attack are void on their face chiefly upon four Supreme Court decisions: Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Guinn v. United States, supra; Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; and Schnell v. Davis, 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093. Analysis of those cases will reveal that they do not apply to the constitutional and statutory provisions before us.

Yick Wo involved the constitutionality, as administered by the Board of Supervisors, of an ordinance of the City and County of San Francisco making it unlawful to establish or maintain a laundry without the consent of the board of supervisors unless such laundry "be located in a building constructed either of brick or stone." Two Chinese Nationals were convicted of violating the ordinances and the two cases wherein they sought habeas corpus were consolidated and decided by the Supreme Court. One was Yick Wo's petition for habeas corpus denied by the Supreme Court of California, and the other a like petition by Wo Lee, on practically identical facts, denied by the Circuit Court of the United States for the San Francisco District. The facts in both cases were without dispute.

Of the 320 laundries in San Francisco, about 310 were constructed of wood, and about 240 were owned and conducted by subjects of China. The board of supervisors followed the policy of issuing permits for laundry operation to all Caucasians and of denying it to all Chinese even though in the cases presented to the court the premises of the Chinese had been inspected and approved by the fire wardens, the health officers, and other city officials. The Supreme Court of California thought that the statute was a proper exercise of the police power, and the United States Circuit Court, in the other case, thought otherwise, expressing the opinion that the ordinances as administered violated provisions of the Fourteenth Amendment and a treaty between the United States and China. In deference to the decision of the Supreme Court of California, however, and contrary to its own opinion, the Circuit Court discharged the habeas corpus writ as the Supreme Court of California had done.

The Supreme Court rejected the decision of the California Court, holding that the ordinances "seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons. * * * The power given to them is not confided to their discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint." 118 U. S. at pages 366–367, 6 S.Ct. at page 1069. The final conclusion of the Supreme Court is epitomized in graphic words copied in the margin.[7] The quota-

United States v. Cruikshank, 1875, 92 U.S. 542, 23 L.Ed. 588; United States v. Reese, 1875, 92 U.S. 214, 23 L.Ed. 563; State of Virginia v. Rives, 1879, 100 U.S. 313, 25 L.Ed. 667; Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497. And cf. McPherson v. Blacker, 1892, 146 U.S. 1, 35, 13 S.Ct. 311, 36 L.Ed. 869; "The question before us is not one of policy, but of power * * *;" and Annotation 153 A.L.R. pp. 1066 et seq.

7. 118 U.S. at pages 373–374, 6 S.Ct. at page 1073: "Though the law itself be fair, and its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution. * * * The present cases, as shown by the facts disclosed in the record, are within this class. It appears that both petitioners have complied with every requisite deemed by the law, or by the public officers charged with its administration, * * * No reason whatever, except the will of the supervisors, is assigned why they should not be permitted to carry on, in the ac-

tion from the Supreme Court's opinion as applied to the facts there refutes the argument the case is called upon to furnish here. The case will be discussed further in our analysis of Schnell, infra. The Constitution and statutes of Mississippi do not contain any license for the exercise of arbitrary power. Plaintiffs are entitled to relief here if they can show the discrimination which was admitted there.

Guinn brought in question the constitutionality of the "Grandfather Clause" inserted by amendment into the Constitution of Oklahoma. That amendment established literacy tests, but exempted from such tests every person "who was, on January 1st, 1866, or any time prior thereto, entitled to vote under any form of government, or who at that time resided in some foreign nation, * * *" The exemption was made to apply also to the lineal descendants of such persons. The court held that the language of the Oklahoma amendment was indisputably aimed directly at the Fifteenth Amendment with the palpable intent of destroying the effect of that Amendment. Its course of reasoning ran thus:

The Fifteenth Amendment provided that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." The Oklahoma Constitution fixed a date, January 1, 1866, as the crucial date, at which time the Fifteenth Amendment had not been passed and no Negro possessed the right of suffrage. By its terms, therefore, the exemption from the literacy test was denied to all Negroes, and was vouchsafed to all others. This being true, the Oklahoma amendment—and the Supreme Court so stated—could have no other purpose, under its very language, than to abridge the right of Negroes to vote by requiring them to pass a literacy test from which all non-Negroes were exempted.

Lane v. Wilson dealt with an Act of the Oklahoma Legislature, 26 Okl.St. Ann. § 71 et seq. passed at a special session immediately following the invalidation of the constitutional amendment in Guinn, which Act the Supreme Court decided was directed solely at a circumvention of the Guinn decision. The scope and reach of Lane v. Wilson can best be evaluated by quotations from the Supreme Court's opinion set forth in the margin.[8]

customed manner, their harmless and useful occupation, on which they depend for a livelihood; and while this consent of the supervisors is withheld from them and from 200 others who have also petitioned, all of whom happened to be Chinese subjects, 80 others, not Chinese subjects, are permitted to carry on the same business under similar conditions. *The fact of this discrimination is admitted. No reason for it is shown, and the conclusion cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong,* and which, in the eye of the law is not justified. The discrimination is therefore illegal, and the public administration which enforces it is a denial of the equal protection of the laws, and a violation of the fourteenth amendment of the constitution. * * *" (Emphasis added.)

8. "Those who had voted in the general election of 1914, automatically remained qualified voters. The new registration requirements affected only others. * * The crux of the present controversy is the validity of this registration scheme, with its dividing line between white citizens who had voted under the 'grandfather clause' immunity prior to Guinn v. United States, supra, and citizens who were outside it, and the not more than 12 days as the normal period of registration for the theretofore proscribed class." 307 U.S. at page 271, 59 S.Ct. at page 874.

"When in Guinn v. United States, supra, the Oklahoma 'grandfather clause' was found violative of the Fifteenth Amendment, Oklahoma was confronted with the serious task of devising a new registration system consonant with her own political ideas but also consistent with the Federal Constitution. We are compelled to conclude, however reluctantly, that the legislation of 1916 partakes too much of the infirmity of the 'grandfather clause' to be able to survive. 307 U.S. at page 275, 59 S.Ct. at page 876.

It is clear that the Supreme Court thought that it was impossible to construe the Oklahoma legislation as having any efficacy which did not perpetuate as a favored class the white citizens, who were the only ones permitted to vote in 1914,[9] and to lay a heavy burden on Negroes aspiring to register under discriminatory requirements which they were forced to meet only because they had been wrongfully excluded from voting right under the unconstitutional provisions of the Grandfather Clause.

The last case relied upon by plaintiffs is the Per curiam opinion of the Supreme Court in Schnell v. Davis, supra, which reads as follows:

"The judgment is affirmed. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. Cf. Williams v. [State of] Mississippi, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012. * * *"

A three-judge District Court for the Southern District of Alabama had written a lengthy opinion and had based its decision upon a number of grounds including a finding that the Boswell Amendment, Const.1901, § 181, there under consideration "has, in fact, been arbitrarily used for the purpose of excluding Negro applicants for the franchise, while white applicants with comparable qualifications were being accepted."[10] From the concluding words of the District Court's opinion[11] it appears that the judgment it entered was to grant an injunction in favor of Schnell. The Supreme Court did nothing more than to affirm that judgment, not indicating which of the several grounds it adopted as the basis for the affirmance.

Viewed most favorably to the contentions of the plaintiffs here, it would be assumed that the Supreme Court decided that the Boswell Amendment placed final and arbitrary powers in the hands of the board of registrars, which power the board had in fact exercised arbitrarily in favor of white applicants and against Negro applicants. As shown above, this was the ground common to Lane and Yick Wo, the two cases forming the predicate for the Supreme Court's action in Schnell.

It is important to note that the Supreme Court, after citing these two cases, directed a comparison with Williams v. State of Mississippi, 1898, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012. There, the literacy tests of the Mississippi Constitution of 1890 were upheld and, as demonstrated infra, the Court held categorically that the doctrine of Yick Wo

* * * * *

"But this registration was held under the statute which was condemned in the Guinn case. Unfair discrimination was thus retained *by automatically granting voting privileges for life to the white citizens* whom the constitutional 'grandfather clause' had sheltered *while subjecting colored citizens to a new burden.*" 307 U.S. at page 276, 59 S.Ct. at page 876. (Emphasis added.)

9. In its decision of Lane v. Wilson the Circuit Court of Appeals for the Tenth Circuit, 98 F.2d 980, 984, stated: "It may be, and we take it as true, that inasmuch as the so-called grandfather clause in the constitution of Oklahoma had not been declared void as violative of the Fifteenth Amendment until 1915 no negroes voted at the 1914 election * * *"

10. Fundamental factual differences differentiate Schnell from the case before us. The Alabama amendment invested the registrars with rigid and arbitrary powers, not requiring that their judgment be "reasonable." It contained no requirement that the examination be in writing or that a record be made of it so that it might be subjected to review. The decision makes no mention of any right of appeal from the decision of the registrars. State agencies took active leadership in compaigning for its adoption, stating openly in writing that the object of the amendment was to curtail Negro registration. As applied, the tests were not required of whites, only Negroes being subjected to them. Not one of these criticisms applies to the Mississippi amendment under the facts presented to us.

11. Davis v. Schnell, 81 F.Supp. 872, 881.

did not apply. The clear meaning of the reference to the three cases by the Supreme Court was that in contrast with the valid requirements of the Mississippi Constitution, the Boswell Amendment involved in Schnell came under the condemnation of the two cases wherein the Supreme Court had pointed out specifically that arbitrary power granted and discriminatorily used could not stand the test of constitutionality.

II

(1) In considering whether amended Section 244 is unconstitutional on its face, it is important to bear in mind that plaintiffs concede that the voting provisions of the Constitution of 1890 were valid. They could not, of course, do less because the Supreme Court of the United States specifically approved them in Williams v. State of Mississippi, 1898, 170 U.S. 213,[12] 18 S.Ct. 583, 42 L.Ed. 1012.

Sections 241, 242 and 244 of the Constitution of 1890 were attacked by motion (20 So. at page 840) as being violative of the due process and equal protection clauses of the Fourteenth Amendment. The motion was grounded on the allegation that the constitutional convention of Mississippi was composed of 134 members, of which only one was a Negro; "that *the purpose and object of said constitution was to disqualify* by reason of their color, race and previous condition of servitude, 190,000 Negro voters." It was contended before the Supreme Court, 170 U.S. at page 215, 18 S.Ct. at page 584, that, "under prior laws there were 190,000 colored voters and 69,000 white voters;" and "that sections 241, 242 and 244 of the constitution of this state are in conflict with the fourteenth amendment to the constitution of the United States, *because they vest in administrative officers the power to discriminate against citizens by reason of their color; and that the purpose of* so investing such officers with such power *was intended by the framers of the state constitution, to the end that it should be used to discriminate against the negroes of the state.*" (Emphasis added.) The contentions there made bear a marked resemblance to those now made before us. Responding to them the Supreme Court of Mississippi said (20 So. 840–841):

> "At this point in the investigation it is sufficient to say that we have no power to investigate or decide upon the private, individual purposes of those who framed the constitution, the political or social complexion of the body of the convention * * * *We can deal only with the perfected work—the written constitution* adopted and put in operation by the convention. * * *
>
> "We find nothing in the constitutional provisions challenged by the appellant which discriminate against any citizen by reason of his race, color, or previous conditions of servitude. * * * All these provisions, if fairly and impartially administered, apply with equal force to the individual white and negro citizen. It may be, and unquestionably is, true that, so administered, their operation will be to exclude from the exercise of the elective franchise a greater proportionate number of colored than of white persons. *But this is not because one is white and the other is colored, but, because of superior advantages and circumstances possessed by the one race over the other, a greater number of the more fortunate race is found to possess the qualifications which the framers* of the constitution deemed essential for the exercise of the elective franchise." (Emphasis added.)

Affirming the decision of the Mississippi Supreme Court in Williams, the

12. The Supreme Court there affirmed the decision of the Supreme Court of Mississippi in Williams v. State, 1896, 20 So. 1023, in which case a memorandum opinion only was written. That memorandum opinion referred to the decision of Chief Justice Cooper in the companion case of Dixon v. State, 74 Miss. 271, 20 So. 839; and consideration of the Dixon decision is necessary to an understanding of the effect of the Supreme Court's decision in Williams.

Supreme Court of the United States considered at length Yick Wo v. Hopkins, supra, more than half of the opinion being devoted to a study of and quotations from that case. The Court quoted what it had said in Yick Wo, which quotation—set forth supra—is the portion of Yick Wo so vigorously urged by plaintiffs before us. But concerning said quoted language the Supreme Court of the United States, after stating "We do not think that this case is brought within the ruling in Yick Wo v. Hopkins," 170 U.S. at page 223, 18 S.Ct. at page 587, said:

> "This comment is not applicable to the constitution of Mississippi and its statutes. They do not on their face discriminate between the races, and it has not been shown that their actual administration was evil; only that evil was possible under them."

The Court, in that decision, quoted and discussed all of the important provisions of the Mississippi Constitution governing the right to vote, and also quoted the contention there made that the Constitution vested in the registrar "the full power, * * * to ask all sorts of vain, impertinent questions; and * * * reject whomsoever he chooses, and register whomsoever he chooses, for he is vested by the constitution with that power. Under section 244 it is left with the administrative officer to determine whether the applicant *reads, understands,* or *interprets* the section of the constitution designated. The officer is the sole judge of the examination of the applicant, and even though the applicant be qualified, it is left with the officer to so determine; and the said officer can refuse him registration." (Emphasis supplied.)

It is of determinant significance that the Supreme Court in Williams rejected all of those contentions and upheld the constitutionality of Section 244 as originally written.

(2) It is pertinent to observe at this point that plaintiffs, having thus conceded the validity of the original 244, make the identical argument that amended 244 is unconstitutional because (a) its language is so vague and indefinite as to furnish no ascertainable standard of action, and (b) it invests the registrar with arbitrary and uncontrolled powers.

(a) The obvious answer to the ground first stated is that the words used in amended Section 244 are the identical terms used in the 1890 Constitution—"read," "reasonable," "interpret," "understand." Every one of those words was used in the original section which plaintiffs find no difficulty in comprehending. The language above quoted shows that the identical contention was made by Williams in his appeal and was rejected by the Supreme Court. It is further clear that the responsible state official was invested with exactly the same powers under the Constitution of 1890 that he has under the amended section.

It is plain that what plaintiffs complain of is, not that the words used in the amendment are vague and indefinite, but that the literacy test imposed by the amendment is slightly more onerous and exacting than that of the original. They complain that the amendment requires an applicant for registration to read *and* write a section of the Constitution. Certainly the original requirement was more rigorous at the time of its enactment than was the amendment when it was adopted.

The Constitution of 1890 was passed when Negroes had just emerged from complete illiteracy—cf. the Supreme Court's language in Brown v. Board of Education, 1954, 347 U.S. 483, 490, 74 S.Ct. 686, 689, 98 L.Ed. 873, "Education of Negroes was almost nonexistent and practically all of the race were illiterate"—and when both Negroes and whites had passed through two decades of the tragedy of Reconstruction when efforts at education were close to the an increasingly competent educational vanishing point. After six decades of system[13] it seems moderate indeed for

13. Last year 268,246 Negroes attended the public schools of Mississippi and 281,684 whites. See Bulletin S.D. 58, Mississippi Department of Education.

the electorate to lay upon itself the obligation of being able to read and write the basic law of the Commonwealth. Understanding and interpretation formed a part of the original Section 244 and they seem all the more proper in this time of general enlightenment.

The same can well be said of the sentence added by the amendment requiring an applicant to demonstrate "a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government." In assaying the reasonableness of such requirements it is well to note that the provision of the Oklahoma Constitution, which the Supreme Court found unexceptionable in Guinn supra (238 U.S. at page 357, 35 S.Ct. at page 928), required the applicant to both read and write, and that the Court rejected the grandfather clause only because it was not able to discover any reason for its arbitrary exemption of those possessing certain qualifications on a specified date except one which flew in the face of the Fifteenth Amendment (238 U.S. at pages 364–365, 35 S.Ct. at page 931). Such is not the case here. At a time when alien ideologies are making a steady and insidious assault upon constitutional government everywhere,[14] it is nothing but reasonable that the States should be tightening their belts and seeking to assure that those carrying the responsibility of suffrage understand and appreciate the form and genius of the government of this country and of the States.

(b) Literacy tests for prospective voters have been in effect in this country for a century, and no case has been brought before us holding that the people of a state have placed themselves under too heavy a burden in setting the standards which will earn the right to vote, and none condemning a literacy test as such. In Lassiter v. Taylor, U.S.D.C.E.D.N.Car.1957, 152 F.Supp. 295, 297–298, attention is called to the fact that nineteen states, only seven of which are Southern states, prescribe literacy tests, and those states and the laws prescribing the literacy tests are listed. Plaintiffs concede that it is proper for Mississippi to enact reasonable literacy requirements for voting. That concession is bound to include the unquestioned concept that it is the states which have plenary and exclusive power to determine what is reasonable. See the language of the Supreme Court opinions in Part I supra. Plaintiff's idea that a literacy test may properly embrace one facet but not two (or two facets but not three) is without sanction of either law or reason. In Trudeau v. Barnes, 5 Cir., 65 F.2d 563, certiorari denied 290 U.S. 659, 54 S.Ct. 74, 78 L.Ed. 571, the Fifth Circuit Court of Appeals approved Louisiana constitutional requirements embracing both reading and interpreting its Constitution and that of the United States.

(c) To attack the language of amended Section 244 as being too vague and indefinite is to ignore a long and unbroken line of decisions approving legislative enactments whose phraseologies are far more nebulous and difficult of ascertainment than the relatively simple terms before us. A few recent examples will suffice. The Supreme Court has recently [15] approved a federal and a state statute, West's Ann.Pen.Code, § 311, 18 U.S.C.A. § 1461 which made criminal the dissemination of literature which was "obscene, lewd, lascivious, filthy, indecent," although it was necessarily left to twelve laymen constituting the jury to determine whether such dissemination had "a substantial tendency to deprave or corrupt the readers by inciting lascivious thoughts or by arousing lustful desires." The Labor Board is given power [16] to ex-

14. Blazoned across the front of the October 3, 1958 issue of U. S. News & World Report are these words in red letters: "Today's War—How The Reds Are Operating In 72 Countries."

15. Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

16. National Labor Relations Board v. Truitt Mfg. Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027.

amine protracted negotiations between representatives of employers and employees and to determine therefrom whether there has been "bargaining in good faith."

In Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, the Supreme Court upheld a criminal statute (18 U.S.C.A. § 242) making it unlawful to deprive any inhabitant of a state "of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States * * * by reason of his color, or race." Those rights, privileges and immunities are legion and are being defined and expanded every day.[17] The Court justified its decision by holding that conviction under the statute can ensue only when the jurors find, under proper instructions, that the rights violated are rights belonging to federal citizenship as distinguished from those inhering in state citizenship. It should be remembered also that every juror in a criminal case is forced to apply his common sense in determining what is or is not a "reasonable" doubt; and jurors trying personal injury suits are required to fashion largely out of their own experience standards of "reasonable" care and "reasonable" prudence upon which to base their verdicts.

(3) To charge that the discretion vested in the Registrar is arbitrary and uncontrolled is to ignore the procedures provided by Mississippi law. Administrative appeal to a board selected by the State Board of Election Commissioners is given *de novo* and, on such appeal, the judgment of the Registrar is so highly tentative and lacking in finality that it is not even prima facie correct. In every instance his judgment must be one based upon reason, and absolute right of appeal to the courts is also provided. This administrative machinery has the explicit approval not only of Williams, supra, but of Peay v. Cox, 5 Cir., 1951, 190 F.2d 123, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 671.

It would be hard to conceive of constitutional provisions which safeguard the rights of applicants for suffrage as well as do the ones under attack. A permanent record is made on forms prepared by state officers and applying uniformly to all applicants, so that anything smacking of discrimination can easily be checked by examination of the public records. This provides a more certain insurance against discrimination than the requirements of original Section 244—providing for oral examination,—which bears the stamp of plaintiffs' approval. Right of appeal is given not only to rejected applicants but to any member of the public who may think that any applicant has been too generously dealt with.

(4) (a) In an attempt to prove that the "purpose," i. e., motive, of the people of Mississippi in amending Section 244 of the Mississippi Constitution was an evil one, plaintiffs sought to introduce in evidence six photostatic copies of newspaper articles expressing the opinion that the object of the constitutional amendment was "aimed at stemming the tide of Negro voters that is growing up in the state." [18] The amendment was voted upon at an election for

17. In Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, it is demonstrated by the four exhaustive opinions that the Judges of the Supreme Court differ radically as to what the quoted words mean.

18. Five of these were assumed copies of one daily newspaper, including two excerpts from editorials, two news stories about the impending election, and one news story about the formation of a Citizens' Council in a Mississippi county. Each contained the expression of the opinion that the amendment was intended to limit Negro registration. This quotation from one of the editorials is typical:

"The second proposed amendment would tighten up the state's voter-registration requirements to curb registration of near-illiterates. * * * The proposed change is wise, desirable and very timely. * * * Adoption of this amendment, and fair and uniform application of the new voter-registration requirements, over the years would steadily raise the average educational

various officials, state and federal. No effort was made to prove that the copies offered were in fact copies of newspapers published at the time and no proof was offered to show that the statements attributed to various individuals were made, or that the opinions were actually expressed.

These articles were permitted to be inserted in the record for whatever value they might have towards proving what the plaintiffs called "climate." No statements were attributed to state officers and the articles purported to express only sentiments which were alleged to be entertained by the private citizens to whom they were attributed. The articles possessed little, if any, probative value.

(b) Plaintiffs also obtained by subpoena copy of an issue of the Clarion Ledger, a newspaper published in Jackson, Mississippi, containing an article by Charles M. Hills in which the number of Negroes supposedly qualified and registered in various counties of the state was discussed. The article showed that Jefferson Davis County had, in 1954, 1,221 registered Negro voters. Hills was offered by plaintiff as a witness and asked as to the correctness of his figures. He replied that he had no personal knowledge at all and no information except what he had obtained, as the article set forth, from the Mississippi Citizens' Council. The figures could have been nothing but an estimate, as the registration records omit entirely any reference to the race of a registrant; but the article was received as a part of the record for whatever probative value it might have.

If the article should be accepted as dependable and as competent proof, some interesting comparisons might be made. In Jefferson Davis County 926 electors cast their ballots in favor of the constitutional amendment [19] and 278 against it. Plaintiffs' newspaper article showed that fifty-four Negroes were registered voters in Itawamba County; in voting on the amendment, 228 citizens of that county voted for the amendment and 1,248 voted against it. The article reflected that 4 Negroes were registered in Pontotoc County; the vote in that county was 339 for the amendment and 1,371 against. Speculation engendered by the article would lead to the conclusion that the adoption of the amendment by well over a two to one majority statewide did not follow at all the pattern of race registration which plaintiffs attempt to ascribe to it.[20]

(c) Plaintiffs, pursuing further the argument that the "purpose" of amending Section 244 was to fashion tools the better to discriminate against Negro applicants, list a number of statutes passed by the Mississippi Legislature in 1954, 1955 and 1956 dealing with the public schools and with other aspects of what

qualifications and intelligence of our citizens. It would also curb the registration of members of groups most likely to engage in 'bloc voting' and we believe that adoption of this amendment would, over a long period, help win the fight to retain our separate school system and social institutions * * * "

The remaining newspaper article was a news story in another newspaper dealing largely with activities of Citizens' Councils.

19. The figures are obtained from "Mississippi Official and Statistical Register, 1956–1960," page 397.

20. Plaintiffs seek to draw an unfavorable inference against defendants from the fact that Governor Coleman declined to honor a subpoena issued by them. This was in keeping with the general law and the traditional policy of governors in Mississippi and in states generally. The Court offered to have Mr. Patterson, a member of the same Commission with the Governor, submitted to examination by plaintiffs, but plaintiffs did not choose so to proceed. It was clear that the testimony which plaintiffs sought to elicit from the Governor was hearsay and undependable because the figures were derived from a letter poll made of registrars which turned out to be incomplete. Plaintiffs had ample opportunity to attempt to make the desired proof by the Registrar of Jefferson Davis County in 1954, or to proceed by interrogatories, request for admission, or the other avenues provided in F.R.C.P., but they did not do so.

plaintiffs term "the state's declared policy of preserving segregation." If we should be tempted to accept "guilt by association" as a proper basis for condemning state action, it would not apply here, because the attack plaintiffs make here is basically upon a constitutional amendment enacted by vote of the people themselves. It was submitted at a time when only one other amendment was on the ballot and that had to do with a technical point applying to corporate procedures. The argument, like those which precede it, is lacking in force.

(5) (a) Having failed to produce any tangible proof to sustain this position, plaintiffs finally call upon us to supply the lack by judicial notice. In other words, we are importuned to rule without proof that, on its face or by reason of its unrevealed sinister "purpose," the constitutional amendment is void. The showing before us wholly fails to warrant serious consideration of so condemning a whole people, which is what we would have to do if we accepted plaintiffs' argument. Neither proof nor judicial knowledge tend to sustain plaintiffs' position.

Even if we had such knowledge by some sort of occult power of divination, we would not have the competence to do what plaintiffs advocate. No case is cited as a precedent for such action, and no proof is offered to sustain it. If we should imagine ourselves possessed of such omniscience and omnipotence, we would find ourselves confronted by a vast array of authority which forbids questioning the motives even of a legislature, certainly of a sovereign people.

(b) Commenting upon the immunity of state legislators from having their motives scrutinized, Judge Learned Hand[21] exclaims: "but of all conceivable issues this would be the most completely 'political,' and no court would undertake it."[22] He also quotes Chief Justice Taney's statement in "License Cases," 5 How. 504, 583, 12 L.Ed. 256: "Upon that question the object and motive of the States are of no importance, and cannot influence the decision. It is a question of power." This question of power was before the Supreme Court in Sonzinsky v. United States, 1937, 300 U.S. 506, 513–514, 57 S.Ct. 554, 81 L.Ed. 772, and the Court denied the competency of courts to make inquiry into motives which might have moved Congress to exercise a power constitutionally conferred upon it. The question was fully considered by the Supreme Court again in Fernandez v. Wiener, 1945, 326 U.S. 340, 362, 66 S.Ct. 178, 189, 90 L.Ed. 116, and the same conclusion was announced in these words: "* * * it is not within the province of courts to inquire into the unexpressed purposes or motives which may have moved Congress to exercise a power constitutionally conferred upon it."[23]

We hold, therefore, that plaintiffs have wholly failed to establish that the amendment to Section 244 of the Mississippi Constitution of 1890 is void on its face or

21. "The Bill of Rights," supra, p. 46.

22. Citing McCulloch v. State of Maryland, 4 Wheat. 316, 423; Doyle v. Continental Ins. Co., 94 U.S. 535, 541, 24 L. Ed. 148; Weber v. Freed, 239 U.S. 325, 330, 36 S.Ct. 131, 60 L.Ed. 308; State of Arizona v. State of California, 283 U.S. 423, 435, 51 S.Ct. 522, 75 L.Ed. 1154; Daniel v. Family Security Life Insurance Co., 336 U.S. 220, 224, 69 S.Ct. 550, 93 L.Ed. 632.

23. Shuttlesworth, etc. v. Birmingham Board of Education, D.C.,1958, 162 F. Supp. 372, 381, affirmed 358 U.S. 101, 79 S.Ct. 221. Cohen v. Beneficial Industrial Loan Corp., 1949, 337 U.S. 541, 552, 69 S. Ct. 1221, 93 L.Ed. 1528; Goesaert v. Cleary, 1948, 335 U.S. 464, 467, 69 S. Ct. 198, 93 L.Ed. 163; State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 1940, 313 U.S. 508, 528, 61 S.Ct. 1050, 85 L.Ed. 1487; United States v. Darby, 1941, 312 U.S. 100, 115, 61 S.Ct. 451, 85 L.Ed. 609; Bailey v. Drexel Furniture Co. (Child Labor Tax Case), 1922, 259 U.S. 20, 39, 42 S.Ct. 449, 66 L.Ed. 817; Daniel v. Family Security Life Insurance Co., 336 U.S. 220, 221, 69 S.Ct. 550, 93 L.Ed. 632; and Doyle v. Continental Insurance Co., 94 U.S. 535, 24 L. Ed. 148.

because it was the product of base motives. We hold, on the other hand, that said amendment and the statutes passed in connection with it are valid on their face and in fact, and are a legitimate exercise by the State of its sovereign right to prescribe and enforce the qualification of voters.

III

(1) This brings us to the contention that plaintiffs, along with other Negroes, were actually discriminated against in the administration of the Constitution and laws of Mississippi by defendant Daniel. If such discrimination was practiced against plaintiffs, the actions of defendant would certainly come under the condemnation of the Fifteenth Amendment, or the Fourteenth Amendment, or both. Plaintiffs put on the witness stand a number of other Negroes, but we look first to their own testimony to determine if either plaintiff proved that he was qualified to register under the Constitution and laws of Mississippi and was denied registration because of his race.

Plaintiff Dillon, conceding that she was properly given the written test provided by the amendment, failed to produce a copy of that test for the Court's inspection. She did not demonstrate in her oral testimony the possession of the qualifications provided in the Mississippi Constitution and statutes, and there is no proof at all, therefore, that she had any status to maintain this action.

According to the testimony of his attorney, plaintiff Darby approached him in April or May, 1956, about the time he wrote President Eisenhower. The attorney called the N.A.A.C.P., which, sometime later, agreed that its Legal Fund would pay the attorneys and the expense of any litigation which might be brought by Reverend Darby.

This was before his first written application of June 29, 1956, in which he stated that he was a farmer. The application was signed by him but was not filled in. It is not claimed that, in this application or the oral tests which came after it, plaintiff Darby showed himself qualified to register. The entire case is predicated on the sworn written application of June 22, 1957, which he took under his attorney's advice and direction. This document, read in the light of the testimony of plaintiff Darby, reveals several deficiencies.

He made no answer to Question 14 inquiring if he had ever been convicted of the crimes enumerated in the question; considerable portions of the answers written by plaintiff are illegible. In response to Question 18 calling upon him to copy Section 123 of the Constitution of Mississippi,[24] he wrote six lines not called for by the question and not possessing marked coherence. In giving his reasonable interpretation of that section he wrote, "the govenner govends all the works of the state and he is to see that all the voilatores be punished and als he can pardon out the penetenter ane pherson." In answering Question 20 which directed him to write his understanding of the duties and obligations of citizenship under a constitutional form of government, he wrote five lines which could hardly be called accurate or responsive to the question.[25]

That he could not write legibly is exemplified by examination of the several documents in the record written by him, and is further attested by the fact that the letter he sent the president was written entirely by someone else, including the signature. He did not attempt, while on the witness stand, to demonstrate that he could read. Every other Negro witness he placed on the stand was given a

24. "The Governor shall see that the laws are faithfully executed."

25. "a citizen is persn has in been in the USA all his days. and is not been convicted of enny crimes and has been Loyal. to his country and pase all his tax."

section of the Mississippi Constitution to read before the Court, but plaintiff himself did not attempt to show his ability to read. The evidence does not, therefore, support the burden imposed on the plaintiffs to show that they were qualified to be registered as voters. *A fortiori* it does not establish that defendant Daniel did not act in good faith or exercise a sound discretion when he made his decision that plaintiffs had not passed the examinations given them.

In passing judgment on this phase of the case we cannot leave out of view that defendant Daniel knew that he was under surveillance by federal officials and that he was dealing with one party who was acting under advice of counsel.

It is fundamental that plaintiffs must stand or fall on the merits of their own case. The Supreme Court stated the principle in McCabe v. Atchison, T. & S. F. R. Co., 1914, 235 U.S. 151, 162, 35 S.Ct. 69, 71, 59 L.Ed. 169, in these words:

> "But we are dealing here with the case of the complainants, and nothing is shown to entitle them to an injunction. It is an elementary principle that, in order to justify the granting of this extraordinary relief, the complainant's need of it, and the absence of an adequate remedy at law, must clearly appear. The complainant cannot succeed because someone else may be hurt. Nor does it make any difference that other persons who may be injured are persons of the same race or occupation. It is the fact, clearly established, of injury to the complainant—not to others—which justifies judicial intervention." (Citing a number of Supreme Court cases.)[26]

(2) Plaintiffs served subpoenas on twenty-five Negro witnesses, of whom fifteen were placed upon the stand. Despite the principles last above quoted and such cases as Reddix v. Lucky, 5 Cir., 1958, 252 F.2d 930, 938, holding that "obviously the right of each voter depends upon the action taken with respect to his own case," we permitted this testimony to be introduced over objection to give plaintiffs a chance to show that there was a class whose rights they might carry if they established their own case, and also that the testimony might be considered as furnishing circumstantial evidence of discrimination in favor of the case of plaintiffs. Although some of the written applications exhibited in connection with the testimony of these witnesses were sufficient to raise an issue of fact as to their qualifications, it is not our province to set ourselves up as registrar of voters.

Some of the testimony certainly demonstrated the absence of qualifications of the applicants. For example, when called upon by Question 18 to copy Section 198 of the Mississippi Constitution, Johnnie B. Darby, plaintiff Darby's wife, wrote: "I have so agreed to be as good a citizen as I possible can I have not yet read the

26. The cases on the subject are collected in an opinion by Chief Judge Hutcheson of the Court of Appeals of the Fifth Circuit in Brown v. Board of Trustees, 1951, 187 F.2d 20, 25, where he quoted from several Supreme Court cases. This language is applicable to the case before us: "All of these considerations, however, are completely beside the mark here, for plaintiff has wholly failed to plead or prove any deprivation *of his civil rights* and it is elementary that *he has no standing to sue for the deprivation of the civil rights of others.* * * *

"It is the individual who is entitled to the equal protection of the laws, and if he is denied * * * a facility or convenience * * * which, under substantially the same circumstances, is furnished to another traveler, he may properly complain that his constitutional privilege has been invaded.

* * * * *

"Cf. Sweatt v. Painter, 339 U.S. 629, 635, 70 S.Ct. 848, 851, 94 L.Ed. 1114, where the court said: 'It is fundamental that these cases concern rights which are personal and present. * * * "petitioner's right was a personal one. It was as an individual that he was entitled to the equal protection of the laws, * * *"'"

Constitution of Mississippi I do try to abide by truth and right as the almighty god privide the understanding and wisdom."

Another witness called upon to copy Section 16 of the Constitution[27] wrote: "Ex post facto laws or laws impaitring obligations contrace St. Shall Be passed." Interpreting that section this same witness wrote: "a man must pay pold tax befor he eagable to voat." This witness gave his occupation as that of teacher.

None of these witnesses took appeals from Daniel's ruling declining to permit them to register. Four of the fifteen passed the written examination, and of those who failed, the wives of two passed. He gave the test to some of the witnesses as many as four times and he invited plaintiff Dillon to come back and try again. The testimony of these witnesses adds little to the solution of the problem before us.

(3) Plaintiffs introduced one bound volume containing seventy-eight original applications. The documents do not show whether the applicants were white or colored. It seems probable that the purpose of introducing this volume was to show that, during this period, all applicants were required to take the written examination, whereas under the constitutional amendment those who were registered voters on January 1, 1954 were required to take only the oral test habitually given under the original Constitution. This does not prove anything which was not readily admitted by defendant Daniel. From the time Daniel came into office January 1, 1956, until the Attorney General of Mississippi advised him of his error, he had been using the forms furnished him by the State Election Commissioners and testing all applicants by written examination. As far as the testimony goes none had objected. The point of this testimony, however, is that undisputedly white and colored were treated exactly alike. Since, according to the undisputed proof, there were only forty to fifty Negro voters registered in the county, the seventy-eight applicants, all of whom passed, necessarily included some white people.

The wrongful interpretation or the misapplication of Mississippi law alone would not give this Court jurisdiction or amount to deprivation of any constitutional rights. Under this phase of the case discrimination alone resulting from the fact that plaintiffs are Negroes can justify maintaining the action or granting the relief sought. The Supreme Court announced the principle in explicit terms in Snowden v. Hughes, 1944, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497, (a case in which Williams v. State of Mississippi, supra, was cited with approval) where the dismissal of an action for want of jurisdiction was approved where a candidate for office sought equitable relief against party officials who refused to certify him as a candidate. The language quoted in the margin controls here.[28]

The essence of the action before us, therefore, is discrimination on the part of the defendant Daniel,—discrimination

27. "Ex post facto laws, or laws impairing the obligation of contracts, shall not be passed."

28. "But not every denial of a right conferred by state law involves a denial of the equal protection of the laws, even though the denial of the right to one person may operate to confer it on another. * * * And where the official action purports to be in conformity to the statutory classification, an erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws.

"The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless there is shown to be present in it an element of intentional or purposeful discrimination.* * * * *But a discriminatory purpose is not presumed,* Tarrance v. [State of] Florida, 188 U.S. 519, 520, 23 S.Ct. 402, 47 L. Ed. 572; *there must be a showing of 'clear and intentional discrimination',* Gundling v. [City of] Chicago, 177 U.S. 183, 186, 20 S.Ct. 633, 44 L.Ed. 725; * * *" (Emphasis supplied.)

against plaintiffs, Negroes, and in favor of white persons. After listening to the oral testimony and examining the documents carefully we are unable to find any tangible or credible proof of discrimination. There is no proof that any white person was ever treated in any manner more favorably than plaintiffs or any other Negroes. The mere showing that of 3,000 qualified voters in Jefferson Davis County, only forty to fifty are Negroes is not sufficient. Plaintiffs carry the burden of showing that plaintiffs have been denied the right to register because they are Negroes, and that white people similarly situated have been permitted to register. This record contains no such proof. The disparity between numbers of registrants, as has been so often pointed out, results doubtless from the fact that one race had a start of several centuries over the other in the slow and laborious struggle toward literacy. This record does not, in our opinion, show that defendant has practiced discrimination. From our observation of his demeanor during the trial and while on the witness stand and of the evidence generally we are convinced that he has shown himself to be a conscientious, patient and fair public official, exerting every effort to do a hard job in an honorable way.

IV

Plaintiffs aver in their complaint that they have a right to maintain this action without exhaustion of the administrative remedies provided under Mississippi law. They base this contention upon the provisions of 42 U.S.C.A. § 1971(d), upon their charge that "where the plaintiff challenges the constitutionality of a state statute or policy, a federal court will not require the exhaustion of administrative remedies;" and upon their assertion that "plaintiff here seasonably attempted to exhaust his administrative remedies and was unable to obtain a decision by the Board of Election Commissioner." These contentions will be discussed in reverse order.

(1) Mississippi's election machinery is under the supervision of the State Board of Election Commissioners consisting of the Governor, the Secretary of State and the Attorney General.[29] This Board is required,[30] "Two months before every general election of representatives in congress, and of electors of president and vice-president of the United States, * * * (to) appoint the commissioners of election for each county * * *" The absolute right of appeal to the county board is given in words reproduced in the margin.[31] Hearings on appeal are provided for by § 3227 of the Mississippi Code (appearing first in the Mississippi Code of 1892) entitled "Appeal heard de novo:"

> "All cases on appeals shall be heard by the boards of election commissioners de novo, and oral evidence may be heard by them; and they are authorized to administer oaths to witnesses before them; and they have power to subpoena witnesses, and to compel their attendance; to send for persons and papers; to require the sheriff and constables to attend them and to execute their process. The decisions of the commissioners in all cases shall be final as to questions of fact, but as to mat-

29. Mississippi Code 1942, § 3204.

30. Ib. § 3205.

31. Ib. § 3224 provides that: "Any person denied the right to register as a voter may appeal from the decision of the registrar to the board of election commissioners by filing with the registrar, on the same day of such denial or within five days thereafter, a written application for appeal."

§ 3225 provides: "Any elector of the county may likewise appeal from the decision of the registrar allowing any other person to be registered as a voter; but before the same can be heard, the party appealing shall give notice to the person whose registration is appealed from, in writing, stating the grounds of the appeal; which notice shall be served by the sheriff * * *"

ters of law they may be revised by the circuit and Supreme Courts. The registrar shall obey the orders of the commissioners in directing a person to be registered, or a name to be stricken from the registration books."

Sections 3228, 3229, 3230 and 3231 provide for hearing of the appeal by the circuit court of the county. The right of appeal to the Supreme Court is given.

The evidence does not show that plaintiff Darby "was unable to obtain a decision by the Board of Election Commissioner." It does show that he seasonably appealed to the County Board of Election Commissioners, thus electing to proceed by statutory appellate procedures, but that he failed to follow them through. On the other hand, he began this civil action four days before the first meeting of the Board held after his appeal. The appeal is still pending and undisposed of.[32] Plaintiffs' first assigned reason is, therefore, without merit.

(2) The cases cited by plaintiffs [33] do not sustain their contention that it is not necessary to exhaust administrative remedies where the claim is asserted that constitutional rights have been violated.

There are decisions [34] holding that, where an appeal presents only matters of law, the court may intervene without awaiting action by the intermediate administrative board which had no power to pass upon legal questions. But such cases do not control here. The written appeal of plaintiff Darby on June 24, 1957 was a general appeal, and the writing which accompanied it, states that he had on June 22, 1957 presented himself to the Registrar, making application to register as a voter "whereupon such instance notwithstanding that I did then and do now possess the necessary qualifications to register, I was denied registration." A letter from his attorney dated September 21, 1957 states that "He has been denied the right to register to vote, notwithstanding that he was then and is now possessed with the necessary qualifications for same." The formal "Contentions" filed by said plaintiff October 7, 1957 raised constitutional questions, but also reiterated the questions of fact theretofore relied upon, to-wit: that defendant Daniel was administering the constitutional and statutory provisions of Mississippi in such a manner as to discriminate against him, and that he was a duly qualified and registered voter in Mississippi prior to Janu-

32. Meetings of the Board are fixed by three Mississippi Statutes: Section 3239 of the Mississippi Code of 1942, first passed in 1880, provides for a meeting "On the first Monday of October preceding a general election, and five days before any other * * *." There was no general or other election in Mississippi during 1957. Section 3226 first passed in 1892, provides for meetings on the first Monday in October after appointment. The reason for this statute is that the time of appointment of the Board is indefinite under Section 3205, *supra*. The Board had been appointed in 1956 and had held a meeting in October of that year. This statute does not apply to any year except the year of their appointment.

The Mississippi Legislature of 1938 passed a new statute, now Section 3240 of the Code, requiring that the Board meet every year on the Tuesday after the third Monday in March, and this is the general meeting. The statutes provide an understandable and reasonable time for the meeting of the Board so that an elector desiring to register may not miss any election, and plaintiff and his attorney were advised by the statutes and by word of the Registrar of the date the Board would meet. Instead of attending the meeting of the Board and prosecuting the appeal they had begun, they filed this civil action.

Plaintiff Rutha Dillon testified that she did not appeal at all.

33. E. g., Gibson v. Board of Public Instruction of Dade County, 5 Cir., 1957, 246 F.2d 913, which holds premature the contention that school children did not pursue administrative remedies where the Florida Constitution, F.S.A.Const. art. 12, § 12, made nonsegregated schools illegal.

34. E. g., Bruce v. Stilwell, 5 Cir., 1953, 206 F.2d 554.

ary 1, 1954, and was entitled to registration without complying with the additional qualifications contained in the amendment to the Constitution. In this state of the record and under the complaint, it is clear that plaintiff's challenge did not relate to questions of law only. We repeat what the Court of Appeals for the Fifth Circuit said in Peay v. Cox, supra:[35] "The commissioners are sworn officers and presumably will give them a fair hearing. They may easily think the petitioners are right in their construction of the Mississippi Constitution * * * If they hold otherwise on that point but that a discrimination is practiced, they may correct that. The Registrar is bound to obey them." The second ground asserted by plaintiffs is, therefore, untenable.

(3) Finally, plaintiffs claim to be exempted from Mississippi procedural laws relating to registration and appeal therefrom, basing their contention upon the Act of Congress approved September 9, 1957, Public Law 85–315, Part IV, Section 131(d)[36]. Plaintiffs would construe the words "shall have exhausted any administrative or other remedies that may be provided by law" as permitting interception of the state remedy of appeal already begun and carried through by Darby to a point just short of hearing before the County Commissioners; and as relieving plaintiff Dillon of having taken the first step towards appeal, or having made any move at all until more than two years after her application had been rejected by the Registrar.

The mechanics set up by Mississippi to determine which applicants are qualified to register embrace three steps: Written application, which is passed upon by the Registrar; appeal from his ruling by the applicant or any other citizen and full hearing before the County Board; and appeal to the Circuit Court of the county. The Court of Appeals for the Fifth Circuit, in Peay v. Cox, 190 F.2d at page 126, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 671, classified even the step carrying the controversy before the courts as administrative under the authority of Federal Radio Commission v. General Electric Co., 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed. 969. To short-circuit the admittedly administrative proceedings short of a hearing and decision by the County Board would be not only to deny exhaustion of administrative remedies, but to stop them before they had begun. Such a conclusion is compelled if two key words of the new federal statute, "remedy" and "exhaust," are given their normal meaning.

Exhaust[37] means to use up, to expend completely. Remedy[38] is defined as "something that corrects, counteracts or removes an evil or wrong; relief; redress." To sustain plaintiffs' position would be to shut off all state action aimed at providing a remedy, at redress. But the words of the statute contemplate that the state be given a chance to "correct" the asserted "wrong". It is difficult to perceive how these words of the statute can be given any efficacy at all or how the constitutional scheme can be fulfilled if federal competence is to be construed as displacing state power in this vital field before the state is permitted to take the first step towards furnishing an administrative "remedy".

The meaning of the quoted words must be determined in the light of state and

35. 1951, 190 F.2d 123, 126, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 671.

36. The section now codified as 42 U.S.C.A. § 1971(d) reads as follows: "The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have *exhausted* any administrative or other *remedies* that may be provided by law." (Emphasis added.)

37. Webster's New World Dictionary, p. 509.

38. Ib. p. 1230.

federal competence as established by the Constitution as construed by the Supreme Court. In balancing the rights of a plaintiff to the protection of the Constitution and the power of a state over suffrage, it is well to keep in mind what the Supreme Court said in Guinn, supra, to the effect that "without the possession of which power the whole fabric upon which the division of state and national authority under the Constitution and the organization of both governments rests would be without support and both the authority of the nation and state would fall to the ground." The state of Mississippi had plenary and exclusive power to fix the qualifications of voters. More than that, it had and must have the power to provide machinery for its enforcement. The machinery provided by it contemplates the relatively ministerial act of registration by the registrar. The heart of Mississippi's machinery lies in the right of any person to appeal to the County Election Commission. That body alone has the power to have a hearing, to consider evidence, to give the time and study incident to a considered conclusion. Its findings and orders are absolutely binding upon the registrar. To take from this administrative scheme the duties conferred on this Board would be to render sterile the undoubted exclusive power of a state over suffrage.

The Supreme Court of the United States has throughout its history recognized the rule that administrative proceedings must be exhausted, and it has been particularly punctilious in requiring the exhaustion of administrative remedies provided by the states.

We are confronted here with the necessity of deciding the point at which a federal court would be warranted in interrupting administrative procedures,—that is, what the statute under consideration means by exhaustion of administrative remedies. The Supreme Court, in handling an action for declaratory judgment in a district court under the Renegotiation Acts, 50 U.S.C.A.Appendix, § 1191, used this language concerning administrative remedies, affirming the act of the district court in declining jurisdiction:[39] "Ordinarily of course issues relating to exhaustion of administrative remedies, as a condition precedent to securing judicial relief, and to the existence of jurisdiction in equity are either separate or separable matters, to be treated as entirely or substantially distinct. The one generally speaking is simply a condition to be performed prior to invoking an exercise of jurisdiction by the courts. The other goes to the existence of judicial power in the basic jurisdictional sense. * * *

"* * * The doctrine, wherever applicable, does not require merely the initiation of prescribed administrative procedures. It is one of exhausting them, that is, of pursuing them to their appropriate conclusion and, correlatively, of awaiting their final outcome before seeking judicial intervention."

The solicitude habitually manifested by the Supreme Court in its traditional dealing with state matters before administrative agencies is well illustrated by the language used in Alabama Public Service Commission v. Southern Railway Company, 1951, 341 U.S. 341, 349–350, 71 S.Ct. 762, 768, 95 L.Ed. 1002: "As adequate state court review of an administrative order based upon predominantly local factors is available to appellee, intervention of a federal court is not necessary for the protection of federal rights. Equitable relief may be granted only when the District Court, in its sound discretion exercised with the 'scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts,' is convinced that the asserted federal right

39. Aircraft & Diesel Equipment Corp. v. Hirsch, 1947, 331 U.S. 752, 764 and 767, 67 S.Ct. 1493, 1499, 91 L.Ed. 1796; and cf. United States v. Abilene & So. R. Co., 265 U.S. 274, 44 S.Ct. 565, 68 L. Ed. 1016; United States v. Sing Tuck, 194 U.S. 161, 24 S.Ct. 621, 48 L.Ed. 917; and Gonzales v. French, 164 U.S. 338, 17 S.Ct. 102, 41 L.Ed. 458.

cannot be preserved except by granting the 'extra-ordinary relief of an injunction in the federal courts.' Considering that '(f)ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies,' the usual rule of comity must govern the exercise of equitable jurisdiction by the District Court in this case. Whatever rights appellee may have are to be pursued through the state courts."

And in Hecht Co. v. Bowles, 1944, 321 U.S. 321, 329–330, 64 S.Ct. 587, 591, 88 L.Ed. 754, the Court upheld the refusal of a District Court to grant an injunction using this language: "We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made.

"* * * We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied. * * *

"* * * Neither body (that is, administrative and court) should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice; neither can rightly be regarded by the other as an alien intruder, * * *"

It seems reasonable that, as applied to the Mississippi statutes under the facts of this case, the exhaustion of administrative remedies provided in the quoted federal statute should, in any event, be held to exist only after the appellate proceedings before the County Election Commissioners have been completed. Such a course would give full protection to the rights of plaintiffs, affording them remedy in the federal courts at the point where the administrative process is by Mississippi statutes committed to the courts. That is consistent with the holding of the Supreme Court in Lane v. Wilson, supra:[40] "To vindicate his present grievance the plaintiff did not have to pursue whatever remedy may have been open to him in the state courts. Normally, the state legislative process, sometimes exercised through administrative powers conferred on state courts, must be completed before resort to the federal courts can be had. * * * But the state procedure open for one in the plaintiff's situation * * * has all the indicia of a conventional judicial proceeding and does not confer upon the Oklahoma courts any of the discretionary or *initiatory* functions that are characteristic of administrative agencies. * * * Barring only exceptional circumstances, * * * resort to a federal court may be had without first exhausting the judicial remedies of state courts." The exercise of such a discretion comports with the holdings of a long line of decisions of the Supreme Court.[41] And compare the language and action in Lane, supra, with that in Alabama Public Service Commission, supra.

We think the foregoing reasoning is sound, but we do not have to rest this phase of the decision upon it because it is quite clear that this case is not governed by the quoted provisions of the Act of September 9, 1957. By its terms it applies only to "proceedings instituted pursuant to this section." Subsection (d) appears as a part of the Civil Rights Act of 1957 bearing the heading: "Sec. 131." That section creates procedures theretofore unknown and vests the Attorney General of the United States with power to institute legal proceedings for private individuals. It is manifest that Subsection (d) applies only

40. 307 U.S. at page 274, 59 S.Ct. at page 875.

41. Burford v. Sun Oil Co., 1943, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Railroad Commission of Texas v. Pullman Co., 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S. Ct. 459, 82 L.Ed. 638; Prentis v. Atlantic Coast Line Co., 1908, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150, and cases cited. And see also Peay v. Cox, supra; Cook v. Davis, 5 Cir., 178 F.2d 595; and Bates v. Batte, 5 Cir., 187 F.2d 142.

to actions so instituted. It follows that plaintiffs cannot maintain this action for the additional reason that they failed to pursue the reasonable and adequate administrative remedies provided by Mississippi law.

V

Plaintiffs attack the constitutionality of the Mississippi statutes covering champerty and maintenance, Section 2049–01 through Section 2049–08 of the Mississippi Code of 1942, this portion of the action being directed chiefly against defendant Patterson, Attorney General of Mississippi. The complaint alleges that the defendant Attorney General threatens to enforce as against the plaintiffs and their attorneys the provisions of these statutes and that, as the result of said threats, plaintiffs and their attorneys are suffering irreparable injury. Plaintiffs' evidence wholly failed to sustain these charges of the complaint. In fact, that evidence showed without dispute that no such threats had been made and that no action was taken or within contemplation which could in any way affect the welfare or the rights of plaintiffs or their attorneys. The statutes have not been passed upon by the courts of Mississippi. Since the evidence fails to establish that any controversy exists between plaintiffs and either defendant with respect to said statutes, and in view of the long line of Supreme Court decisions committing such matters at least primarily to state court action, Amalgamated Clothing Workers of America v. Richman Bros., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600; Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L. Ed. 138; Douglas v. City of Jeanette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; and Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416, and cf. 28 U.S.C.A. § 2283, plaintiffs cannot maintain this phase of their complaint.

It results from the foregoing views that plaintiffs are not entitled to any of the relief sought. We are, therefore, entering an order dismissing the complaint.

Dismissed.